**Arlene KELLER, as Personal Representative of the Estate of Gerald D. Keller, Plaintiff-Appellant,**

v.

**The MIAMI HERALD PUBLISHING CO., a Florida corporation, Defendant-Appellee.**

**Arlene KELLER, as Personal Representative of the Estate of Gerald D. Keller, Plaintiff-Appellant,**

v.

**The MIAMI HERALD PUBLISHING CO., a Florida corporation, and Knight-Ridder Newspapers, Inc., a Florida corporation, Defendants-Appellees.**

**Nos. 84–5506, 84–5641.**

United States Court of Appeals, Eleventh Circuit.

Dec. 19, 1985.

Rehearing and Rehearing En Banc Denied Jan. 24, 1986.

Patricia A. Peoples, R. Stuart Huff, Coral Gables, Fla., for plaintiff-appellant.

Thomson, Zeder, Bohrer, Werth, Adorno & Razook, Sanford L. Bohrer, Laura G. Pula, Richard Ovelmen, Miami, Fla., for defendant-appellee.

Before GODBOLD, Chief Judge, TJOFLAT, Circuit Judge, and SIMPSON, Senior Circuit Judge.

TJOFLAT, Circuit Judge:

The principal question presented in these consolidated appeals [1] is whether an editorial cartoon defamed the appellant's decedent. The district court concluded that the cartoon was not capable of being interpreted as a defamatory statement of fact and therefore granted appellees' motions for summary judgment. We agree with the district court's conclusion and affirm.

I.

This case arose out of publicity surrounding the operation of Krestview Nursing Home [2] located in Miami, Florida. Gerald Keller, appellant's decedent, owned the home and leased the facility to others who operated it. Krestview became the focus of public attention in 1977 when the Miami Herald, in a series of articles, reported that Keller's lessee had been convicted of misusing $50,000 in state funds earmarked for the patients' personal expenditures. The articles specifically stated that Keller had not been suspected of criminal conduct.

---

1. The district court's subject matter jurisdiction was conferred by 28 U.S.C. § 1332 (1982) (diversity of citizenship).

2. In 1979, the home was renamed Hanover House. The name change is not pertinent to this appeal, and we shall refer to the facility as Krestview.

On February 4, 1979, the Herald published a long article detailing what the reporter considered to be extremely poor conditions at the Krestview facility.[3] The article named the former and then current operators of Krestview and identified Keller as Krestview's owner. The article also revealed that Keller had been paid $337,014 for twelve months' rent (presumably for the year 1978), although this amount was more than half the property's assessed value.

On July 28, 1980, the Health Care Financing Administration (HCFA), the federal agency responsible for Medicaid reimbursements and for overseeing state enforcement of Medicaid regulations, sent an inspection team to Krestview. The team cited in their report various deficiencies in the level of care afforded patients at Krestview. Upon completion of the inspection, HCFA immediately informed the State of Florida Department of Health and Rehabilitative Services (HRS) that HCFA would cut off Medicaid payments to Krestview in thirty days.

Reacting to HCFA's decision, HRS filed in state court a petition for injunctive and declaratory relief, seeking authority to transfer Krestview's patients to other nursing homes and to close the facility permanently. The court entered a consent order proposed by the parties which permitted HRS to take over the facility "in order to insure the health, safety and welfare of patients." During the weeks that followed, HRS operated Krestview while evacuating patients to other facilities; on October 28, 1980, Krestview was closed.[4]

The Miami Herald published four articles between July 25 and October 28, 1980, reporting on HRS's seizure of Krestview. The article appearing on October 28, the day Krestview was closed, recounted the troubled history of the home, including the criminal investigations of its operators. None of these articles identified Keller as one of Krestview's operators or indicated that he had been a target of any criminal investigation.

On October 29, 1980, the Herald published an editorial cartoon[5] which depicted three men in a dilapidated room. On the back wall was written "Krest View Nursing Home," and on the side wall there was a board which read "Closed By Order Of The State of Florida." The room itself was in a state of total disrepair. There were holes in the floor and ceiling, leaking water pipes, and exposed wiring. The men in the room were dressed in outfits resembling those commonly appearing in caricatures of gangsters. Each man carried a sack with a dollar sign on it. One of the men was larger than the other two and was more in the forefront of the picture. One of the others addressed him. The caption read: " 'Don't Worry, Boss. We Can Always Reopen It As A Haunted House For The Kiddies ...' "

Two and one-half years after the cartoon appeared, this libel action was filed against the Miami Herald Publishing Co. by the personal representative of Gerald Keller's estate.[6] The complaint alleged that Keller had been defamed because the cartoon falsely depicted Krestview as being in the physical condition portrayed in the picture and because the cartoon falsely identified

---

**3.** The article quoted from official reports of the Florida Department of Health and Rehabilitative Services (HRS) which described mice in patients' beds, urine in the corners of the rooms, and a crying, writhing patient covered with feces and restrained in a chair. The article then proceeded to describe a room in which a portion of the ceiling had caved in several weeks earlier. The story reported that the facility had been operated well below all applicable health and safety standards.

**4.** Shortly thereafter, Keller sued HRS in state court claiming that its closing of Krestview con-

travened the consent order entered by the state court. At the time the district court entered the summary judgments now before us, this case was still pending. It has no bearing on these appeals.

**5.** The cartoon appears as an appendix to this opinion.

**6.** Gerald Keller died prior to the filing of this suit. In Florida, however, a libel action survives the death of the injured party. *See* Fla. Stat. § 46.021 (1983).

him as a criminal. Miami Herald Publishing Co. moved for summary judgment,[7] and Keller's personal representative simultaneously moved the court for leave to file an amended complaint adding Knight-Ridder Newspapers, Inc., as a party defendant. Apparently, there was some doubt whether Knight-Ridder or Miami Herald Publishing Co., a division of Knight-Ridder, had published the newspaper in which the cartoon appeared. The court granted Miami Herald Publishing Co.'s motion for summary judgment, concluding that the cartoon was a statement of pure opinion and was not capable of being interpreted as a defamatory statement of fact. The court then granted the personal representive's motion for leave to amend, and Knight-Ridder was made a defendant in the case. Knight-Ridder promptly moved for summary judgment, and the court granted its motion, again concluding that the cartoon constituted a statement of pure opinion.

Keller's personal representative appeals from both summary judgments, claiming that summary judgment was inappropriate in both instances because several material facts remain unresolved.[8] Because we conclude that the challenged cartoon could not reasonably have been interpreted as depicting an actual room in Krestview and as implying that Gerald Keller had engaged in specific criminal activity and, because the reasonable inferences which would have been drawn from the cartoon were either

true or a statement of pure opinion, we affirm.

## II.

In passing on the propriety of the district court's grants of summary judgment, we apply the same legal standard a district court must employ, *Thrasher v. State Farm Fire & Casualty Co.*, 734 F.2d 637, 638 (11th Cir.1984) (per curiam): that the evidence, viewed in a light most favorable to the party opposing the motion, demonstrates the absence of a genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). We hold that, because the cartoon in question was not capable of being interpreted as a defamatory statement of fact, appellees were entitled to summary judgment as a matter of law.

■ The rule of decision in a diversity action is provided by state law. *Erie Railroad v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). Florida law requires as part of a successful libel suit that the statement at issue be reasonably capable of a defamatory interpretation; this determination is to be made by the trial judge in the first instance, prior to the jury's evaluation of whether the statement

7. The motion for summary judgment is not in the record. The district court's docket sheet indicates that the motion was filed on February 16, 1984, and that the clerk of the district court is "unable" to locate it. The contents of the motion are not necessary to our disposition of these appeals.

8. Appellant also contends that the summary judgments were granted before she had an opportunity to participate in necessary discovery. At the time the court granted Miami Herald Publishing Co.'s motion for summary judgment, appellant had a motion to compel answers to interrogatories, motion to compel production of documents, and subpoenas for two Miami Herald editors pending before the court. When Knight-Ridder Newspapers, Inc. was added as a party, appellant sought the same discovery she had sought from Miami Herald Publishing Co. Summary judgment was granted Knight-Ridder

before any of appellant's discovery requests were satisfied. The information sought to be discovered by appellant, however, had no relevance to the issues upon which the summary judgments were granted. Appellant attempted to discover information concerning the motivation behind the publication of the cartoon and the facts the Herald had in its possession concerning Keller and Krestview's operation at the time, factors relevant only in determining whether the appellees acted negligently or with actual malice in publishing the cartoon. Because the summary judgments were granted on the ground that the cartoon was not capable of being interpreted as a defamatory false statement of fact, neither negligence nor malice was relevant; therefore, we find no reversible error in the district court's curtailment of appellant's discovery.

was in fact understood as defamatory.[9] *Belli v. Orlando Daily Newspapers, Inc.,* 389 F.2d 579, 583 (5th Cir.1967), *cert. denied,* 393 U.S. 825, 89 S.Ct. 88, 21 L.Ed.2d 96 (1968).[10] In addition, the plaintiff must show that the statement was a false statement of fact as distinguished from opinion, which is protected by the first amendment. *Hay v. Independent Newspapers, Inc.,* 450 So.2d 293, 295 (Fla.Dist.Ct.App.1984); *Palm Beach Newspapers, Inc. v. Early,* 334 So.2d 50, 52 (Fla.Dist.Ct.App.1976) (per curiam), *cert. denied,* 354 So.2d 351 (1977), *cert. denied,* 439 U.S. 910, 99 S.Ct. 277, 58 L.Ed.2d 255 (1978).[11] Whether the challenged statement was one of fact or opinion is likewise a question of law to be decided by the court. *See From v. Tallahassee Democrat, Inc.,* 400 So.2d 52, 56–57 (Fla.Dist.Ct.App.1981).

With these guidelines before us, we examine the cartoon, determining first how a reasonable individual would have interpreted it. As the Supreme Court has acknowledged, the circumstances in which statements are expressed must play an essential role in arriving at a reasonable interpretation. In *Greenbelt Cooperative Publishing Association v. Bresler,* 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970), a newspaper was held liable in Maryland state court for republishing several speakers' comments at a city council meeting that the plaintiff was "blackmailing" the council so he could obtain some zoning variances. The Supreme Court granted certiorari and reversed, holding that, as a matter of law, the word "blackmail," when considered in the full context of the article, could not reasonably have been interpreted as alleging that the plaintiff had engaged in criminal activity. Rather, the word was "no more than rhetorical hyperbole, a vigorous epithet used by those who considered [the plaintiff's] negotiating position extremely unreasonable." *Id.* at 14, 90 S.Ct. at 1542.

In *Old Dominion Branch No. 496, National Association of Letter Carriers v. Austin,* 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974), the plaintiffs, three non-union employees, were included on a list of "scabs" circulated by the Letter Carriers Union in the monthly newsletter to its members. Accompanying the newsletter was a well-known piece of trade union literature attributed to Jack London which defined a scab as "a traitor to his

9. *See generally Washington Post Co. v. Chaloner,* 250 U.S. 290, 293, 39 S.Ct. 448, 448–49, 63 L.Ed. 987 (1919); W. Prosser. Handbook of the Law of Torts § 111, at 747–48 (4th ed. 1971).

10. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

11. In *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Supreme Court suggested that the first amendment immunizes statements of pure opinion from defamation suits, because unlike statements of fact, opinions can never be false:

Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in "uninhibited, robust, and wide-open" debate on public issues.

*Id.* at 339–40, 94 S.Ct. at 3007 (footnote omitted) (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964)). This language from *Gertz* concerning the protected status of opinion is dicta. The actual holding of the case was that private, as opposed to public, figures do not have to prove that a false statement was published with actual malice. Although only dicta, a majority of federal courts, including this circuit, have treated this language as controlling. *See, e.g., Hallmark Builders, Inc. v. Gaylord Broadcasting Co.,* 733 F.2d 1461, 1464 (11th Cir.1984); *Church of Scientology v. Cazares,* 638 F.2d 1272, 1286 (5th Cir.1981); *Ollman v. Evans,* 750 F.2d 970, 974–75 & n. 6 (D.C.Cir.1984) (en banc), *cert. denied,* —— U.S. ——, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985) (listing decisions of various circuits treating the statement as controlling law and noting that the dicta was recently quoted with approval by the Supreme Court in *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, ——, 104 S.Ct. 1949, 1961, 80 L.Ed.2d 502 (1984)). As the court in *Ollman* recently noted, the Supreme Court has provided little guidance in distinguishing between statements of fact and opinion. 750 F.2d at 975.

God, his country, his family and his class." The plaintiffs obtained a libel judgment in a Virginia state court which was affirmed on appeal. The Supreme Court, relying on *Greenbelt,* reversed. The Court held that the statement could not reasonably have been interpreted as charging the employees with treason; the Court viewed the words "in a loose, figurative sense" and referred to the statement as "merely rhetorical hyperbole, a lusty and imaginative expression of the contempt felt by union members toward those who refuse to join." 418 U.S. at 284–86, 94 S.Ct. 2781–82.

Florida courts have followed the Supreme Court's lead in assessing allegedly defamatory remarks, considering such remarks in the light of all of the surrounding circumstances. In *Palm Beach Newspapers, Inc. v. Early,* 334 So.2d 50 (Fla.Dist. Ct.App.1976) (per curiam), *cert. denied,* 354 So.2d 351 (1977), *cert. denied,* 439 U.S. 910, 99 S.Ct. 277, 58 L.Ed.2d 255 (1978), the district court of appeal overturned a $1 million libel award in favor of a school superintendent against a newspaper. The libel purportedly occurred in a series of articles highly critical of the superintendent's performance. The court ruled that phrases and words such as "fingers in the pot," "cheating," and "stealing from the public," when read in proper context, could not have been understood as accusing the plaintiff of committing any criminal offense. *Id.* at 52 (citing *Greenbelt*). Rather, the court viewed the remarks as falling "in the category of what the courts have chosen to call 'rhetorical hyperbole' or 'the conventional give and take in our economic and political controversies.'" *Id.* at 53 (no citations provided).

If a court must consider the circumstances giving rise to the publication of a statement to determine how the statement must have been understood, then certainly it must take note of the medium through which the statement is expressed. Car-

toonists employ hyperbole, exaggeration, and caricature to communicate their messages to the reader. One cannot reasonably interpret a cartoon as literally depicting an actual event or situation. No one could reasonably have considered the cartoon here as portraying the actual conditions of one of the rooms at Krestview at the time of its closing. Rather, the cartoonist must be viewed as having utilized the art of exaggeration to express the notion that Krestview was in very poor physical condition. Likewise, it would have been unreasonable to interpret the cartoonist as alleging that Gerald Keller was involved in specific criminal activity or was a member of organized crime merely because the three men in the cartoon were dressed like gangsters.[12] Clearly, the cartoonist was using the gangster caricature "in a loose, figurative sense" to express the statement that Keller made a great deal of money by taking advantage of sick, elderly people. Appellant's strictly literal interpretation ignores the nature of a cartoon and how cartoons are traditionally understood by those who view them: "[Such an] interpretation does not construe [the cartoon] as the common mind would understand [it] but is tortured and extreme." *Valentine v. C.B.S., Inc.,* 698 F.2d 430, 432 (11th Cir.1983) (per curiam).

We next consider whether the two statements appellant challenges which were reasonably inferable from the cartoon—that Krestview was poorly maintained and that Gerald Keller had taken undue advantage of its patients—were capable of being defamatory. A statement may be defamatory if it "tends to subject one to hatred, distrust, ridicule, contempt or disgrace." *Barry College v. Hull,* 353 So.2d 575, 578 (Fla.Dist.Ct.App.1977); *see also* Restatement (Second) of Torts § 559 (1977) (communication defamatory if it lowers the individual in the estimation of community or deters others from associating with him).

---

**12.** It is undisputed that none of the figures in the cartoon bore any resemblance to Keller. Nevertheless, a reader might reasonably have concluded that the "Boss" in the cartoon was Krestview's owner, Gerald Keller. Consequent-

ly, it would have been improper for the district court to have granted summary judgment on the ground that, as a matter of law, the cartoon did not depict Keller. We assume, for sake of argument, that the cartoon did depict Keller.

Under this definition, both challenged statements were capable of being defamatory as both could have subjected Gerald Keller to ridicule or contempt.

In addition to being capable of defamatory meaning, however, a publication, to be actionable, must be false and consist of a statement of fact. *See Hay v. Independent Newspapers, Inc.*, 450 So.2d at 294–95. The evidence before the district court when it granted the summary judgments established beyond doubt that Krestview had been poorly maintained.[13] The first statement appellant challenges was not false and thus was not actionable. We turn, then, to whether the cartoon's suggestion that Keller acted objectionably by taking advantage of Krestview's patients constituted a statement of fact or opinion.

Opinions are protected from defamation actions by the first amendment. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974); *From v. Tallahassee Democrat, Inc.*, 400 So.2d at 56.[14] Although fashioning a rule to distinguish between statements of fact and opinion may seem intuitively simple in the abstract, courts, without Supreme Court guidance, have struggled to formulate a test that is workable in actual practice. Florida courts have adopted the rule the Ninth Circuit fashioned in *Information Control Corp. v.*

*Genesis One Computer Corp.*, 611 F.2d 781, 783–84 (9th Cir.1980):

In determining whether an alleged libelous statement is pure opinion, the court must construe the statement in its totality, examining not merely a particular phrase or sentence, but all of the words used in the publication. The court must consider the context in which the statement was published and accord weight to cautionary terms used by the person publishing the statement. All of the circumstances surrounding the publication must be considered, including the medium by which it was disseminated and the audience to which it was published.

*Hay v. Independent Newspapers, Inc.*, 450 So.2d at 295 (citing *Information Control*). Applying this test to the cartoonist's statement that Keller's profiting at the expense of Krestview's patients was objectionable, we think it clear that the statement constituted an opinion. Both the historical context surrounding the statement and the medium through which the statement was expressed indicate that the cartoonist was rendering an opinion about the situation. The cartoon appeared following the closing of a nursing home that had received a great deal of adverse publicity; the public was well aware of the facts that led to Krestview's closing. In this context, one viewing the cartoon would certainly have

---

**13.** The court had before it overwhelming evidence that Krestview was in poor physical condition. Appellees filed with the court a copy of a 1979 Dade County Grand Jury Report on Nursing Homes that set forth in detail numerous examples of deficiencies both in the upkeep of the patients and the physical structure of the home itself. Also presented to the court was a copy of the HCFA report prepared after the federal inspection of Krestview in July 1980, which further detailed the deterioration of the conditions at the home. Appellant argues that such evidence is hearsay and therefore should not have been considered by the court. Both pieces of evidence, however, were admissible under Fed.R.Evid. 803(8)(B), (C) which admits as an exception to the hearsay rule

[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ... (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, ... or (C)

in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

The Grand Jury Report was made pursuant to chapter 905 of the Florida Statutes. The federal report was prepared pursuant to 42 U.S.C. §§ 1396–1396p (1982). Appellant presents no persuasive evidence that would suggest that either piece of evidence was untrustworthy. In addition, she presented little evidence to rebut the conclusion that Krestview was in a deteriorated condition. Because appellant failed to create a genuine dispute as to this issue, the trial court was entitled to conclude that Krestview's condition at the time depicted in the cartoon was substandard.

**14.** *See supra* note 11.

recognized that the cartoonist was expressing his opinion of the affair. This was made obvious by the very nature of the statement itself—that Keller's monetary gains at the expense of the elderly were objectionable. The statement was not capable of verification; ordinarily, an individual's morality or immorality is not subject to empirical proof. Finally, the medium in which the statement was expressed clearly signaled to its readers that the statement was merely an opinion. Cartoons are seldom vehicles by which facts are reported; quite the contrary, they are deliberate departures from reality designed forcefully, and sometimes viciously, to express opinion. *See Palm Beach Newspapers, Inc. v. Early,* 334 So.2d at 53. In short, the cartoonist's statement that Keller objectionably profited at the patients' expense was an opinion.[15]

Finally, we examine this statement to determine whether it was a pure or mixed opinion. The expression of mixed opinion occurs "when an opinion or comment is made which is based upon facts regarding the plaintiff or his conduct that have not been stated in the [cartoon] or assumed to exist by the parties to the communication." *From v. Tallahassee Democrat, Inc.,* 400

So.2d at 57; *see also* Restatement (Second) of Torts § 566 (1977). Such a statement does not share in the first amendment protection accorded pure opinion; that is, those opinions based on facts set forth in the communication or reasonably assumed to exist. *See Eastern Air Lines, Inc. v. Gellert,* 438 So.2d 923, 927 (Fla.Dist.Ct. App.1983). The statement expressed in the cartoon about Keller's profit taking was a pure opinion. The facts upon which the statement was based were contained in the cartoon: the condition of the nursing home and the large amount of money the "Boss" had made. In addition, the facts surrounding the Krestview affair had been well publicized so that the Miami Herald's readers were aware of the series of events upon which the cartoonist based his opinion. For this reason we hold that the expression in the cartoon about Keller was a pure opinion and therefore protected from this libel suit by the first amendment.[16]

### III.

The judgments of the district court are, accordingly,

AFFIRMED.

---

**15.** A similar test to distinguish between fact and opinion has recently been fashioned by an en banc court of the District of Columbia Circuit Court of Appeals in *Ollman v. Evans,* 750 F.2d at 979–84. Under this approach four factors must be examined: (1) the common usage or meaning of the statement; (2) the degree to which the statement was verifiable; (3) the context in which the statement occurred; and (4) the broader social context into which the statement fit. Applying such a test to the statement concerning Keller's profit taking, it becomes even more apparent that what we have before us is an expression of opinion.

**16.** We do not address the question of whether an opinion accusing an individual of a specific criminal act is protected from suit, *see Palm Beach Newspapers, Inc. v. Early,* 334 So.2d at 52, because we hold that the cartoon in question could not reasonably have been interpreted as accusing Gerald Keller of such an act.