[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 28, 2002
THOMAS K. KAHN
CLERK

_____

No. 01-15821

_____

D. C. Docket No. 99-00142-CV-JTC-3

NEAL HORSLEY,
d.b.a. Pathway Communications,
d.b.a. Christiangallery.com,
d.b.a. Bestchoice.com,
d.b.a. The Creator's Rights Party,

Plaintiff-Appellee,

versus

GERALDO RIVERA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(May 28, 2002)**

Before BIRCH, HILL and HALL[*], Circuit Judges.

_____

[*] Honorable Cynthia Holcomb Hall, U.S. Circuit Judge for the Ninth
Circuit, sitting by designation.

HALL, Circuit Judge:

Defendant/appellant Geraldo Rivera appeals the district court's determination that a statement Rivera made to plaintiff/appellee Neal Horsley during the course of a television program hosted by Rivera is not protected as a matter of law by the First Amendment of the United States Constitution nor by applicable state law. Rivera asserted that Horsley was an "accomplice to murder." Because we find that Rivera's allegedly defamatory statement is absolutely protected as rhetorical hyperbole by both the First Amendment and applicable state defamation law, we reverse.

## FACTS

Horsley brought this action against Rivera for libel and slander based on an allegedly defamatory statement that was made during the course of a 1998 television interview.

An anti-abortion activist and founder of the Creator's Rights Party, Horsley created and operated a number of anti-abortion web sites on the Internet. One of these web sites listed the names, addresses and Social Security numbers of individual doctors who were known to perform abortions.

In October 1998, Dr. Bernard Slepian, a medical doctor who performed abortions as part of his practice, was shot and killed while standing in the kitchen

of his home in Buffalo, New York. His murder attracted national and international media attention. Horsley claims that Dr. Slepian's name and address were not posted on his web site prior to the murder; however, subsequently, Horsley added this information to his list of doctors known to perform abortions and then graphically crossed out Dr. Slepian's entry (Horsley struck an "X" through the entry for Dr. Slepian's name).

On October 27, 1998, four days after the murder of Dr. Slepian, Horsley voluntarily appeared as a participant on the "Upfront Tonight" news and talk-show program hosted by Rivera, broadcast live by the CNBC cable network (the "Program"). At the beginning of the segment of the Program dealing with Horsley's activities, Rivera introduced Horsley, described his anti-abortion web site, and reminded viewers of the recent murder of Dr. Slepian: "The victim of the most recent attack, Dr. Slepian, was well known to abortion opponents. His name and address were posted on a bizarre anti-abortion Web site called The Christian Gallery. Its title page drips with computer-generated blood. Neal Horsley is the owner of that Web site and founder of the so-called Creators Rights Party." Rivera concluded his introduction by addressing Horsley:

Rivera:     Now I understand that, technically, you've spoken out against the death – of the murder of Dr. Slepian. You said, "We want to make one thing clear, that we don't want to see anybody die." Yet by crossing out his name on the hit list as he was murdered, as you have

3

for others who have been killed, it seems to me, sir, that you are, in fact, encouraging others to strike out with violence.

Horsley: What it seems like to you is not at all what we're doing. I've been saying for five years that we are gonna be facing a pattern of escalating domestic terrorism in this nation. You call this program a – a war against abortion. The fact is, a war is what happens when government gives its citizens permission to kill other people. And the government of the United States of America gave the citizens of this nation permission to kill unborn babies. That's when the war started. What I'm trying to do is put an end to this war by trying to overturn Roe v. Wade.

Rivera: Overturn is a – is a constitutional fight. It may be a courtroom fight. But in listing these people's names and their addresses and their Social Security number, what you are doing, in my opinion is aiding and abetting a homicide.

Horsley: Well, you're entitled to your opinion, and certainly every – everybody has one, but what I'm doing is doing exactly what we say. We're trying to accumulate evidence because our hearts' desire – is to see the day come when we can prosecute these people who make a living killing God's children. That's what we want to do. And we have the right, as American citizens, to try to change the law through legal means so that we can, in fact, see the day come when these people could be brought to the bar of justice.

Rivera: You know, you speak of justice and yet you cross out a man's name. He's shot dead in front of his family, a bullet coming through the window of his home; a coward's attack. How can you sit there with a straight face and pretend such righteousness?

Horsley: I'm not pretending righteous – I've got blood of these children on my hands. As a citizen of the United...

Rivera: You may have the blood of this doctor on your hands, Mr. Horsley.

Horsley: Well, I – the – the point is that 3,000 babies a day are dying. And as a

4

citizen of the United States of America, I have a choice. I can stand by and collaborate with that slaughter or I can do what I can do to stop it. It's not against the law for me to keep a list of people who are – are practicing – making a living killing babies. That's all I've been doing.

Rivera: Would you dare say that to Dr. Slepian's widow? Would you dare say that to his children?

Horsley: I say that now. That's exactly what I'm doing. I say that to every abortion doctor and every family of every abortionist in the country, that we really want to see you brought to justice. We want to see you tried, because what you're doing is killing God's children.

Rivera: And where – and where in your faith – where in the Christian faith does it – does it justify what you do by – by giving information that would allow a murderer access...

Horsley: What we're...

Rivera: ...that would allow a target to be made more vulnerable than ever? Where in the Bible does it give you that right?

Horsley: The – the Yellow Pages gives the same information that we give. And the Bible says that God ordains government to enforce the law, to protect the lives of – of people who are being slaughtered unmercifully, and that's what's happening to these babies. And – and everybody can ignore 'em, but there are people here who are not going to ignore the slaughter of these children.

Rivera: And how about the slaughter of this man? This man who...

Horsley: It's a tragedy. I've said it's a tragedy.

Rivera: ...they say in the Buffalo area was a – a man who mercifully ga – gave birth or helped women give birth in difficult conditions; who was generous of spirit; who was a compassionate man; who helped many more babies be born than he ever performed the – the – the procedure of abortion. What about him?

5

Horsley:     I'm not trying to...

Rivera:      Does that makes [sic] 3,001?  Is his death less than theirs?

Horsley:     I had nothing to do with his death, nor am I trying to justify...

Rivera:      How can you say that?  You crossed out his name on that damn list.

Horsley:     Because...

Rivera:      How dare you?

Horsley:     Because I'm keep – I'm keeping a list of the people who are being killed, because I've been saying all along, it's not just babies who are at risk.  Geraldo, my life is at risk.  Your life is at risk.  This whole nation's very existence is at risk.

Rivera:      You are an accomplice to homicide, Mr. Horsley.

Horsley:     You are, too, because you're – you're showing exactly the same information.  You're telling people about The Nuremberg Files list.  You're a collaborator just like I am, if that's true.

Rivera:      If giving you publicity is, then I feel ashamed.  I feel deeply ashamed of myself.

Horsley:     Well, you should be because you – that's how you sell – that's how you sell your time.

Rivera:      Oh, go on, sell our time.

Horsley:     You sell your time.  That's what you're doing.  That's why you've got me on here, because people are tuning in.  You know it.  They know it.

Rivera:      Because people want to see the real face of a – of an accomplice to homicide, and they're looking at your face now.  And they understand what you're doing.

6

Horsley:     Well, you can call me what you want to call me.

Rivera:      And don't think to fool with rhetoric, with your empty rhetoric. You have – you have set back the pro-life movement. You – take to people like the Reverend Falwell, and they look at you with disdain. They look at you with disgust for what you are doing.

Horsley:     I don't care what they look at me as.

Rivera:      And you pretend to use the Constitution to shield your activities.

Horsley:     What I care about is the fact there are 3,000 babies being slaughtered every day, and I'm gonna do my best to see it stopped.

Rivera:      If – if – if you are the face of the pro-life movement, then you have helped defeat the very movement that you say you cherish.

Horsley:     Well, you can say that, but we'll see what happens over time.

Rivera:      Yeah. We'll see.

Horsley:     That's where it'll turn.

Rivera:      Is my name going to be on your list next?

Horsley:     I hadn't thought about it...

Rivera:      Yeah.

Horsley:     ...but it – it's a good idea.

Rivera:      Good night. Good night, Mr. Horsley, I'm sure.

Soon after appearing in this interview, Horsley began receiving threatening emails and letters. Many of these messages contained death threats against Horsley or his family.

Horsley filed suit against Rivera for libel and slander, asserting that Rivera made false and malicious defamatory statements against him by falsely accusing accusing him of committing a felony -- specifically, of being an accomplice to murder in the death of Dr. Slepian.[1]  Rivera moved for judgment on the pleadings, asserting that the statement he made during the 1998 interview is a constitutionally-protected expression of opinion based on fully disclosed facts and/or rhetorical hyperbole.  The district court disagreed, and denied Rivera's motion, determining that neither the First Amendment nor Georgia defamation law protected the statement.  Rivera then filed a Motion for Reconsideration, or in the alternative, a Request for Certification for Interlocutory Appeal pursuant to 28 U.S.C. § 1292(b).  The district court denied Rivera's Motion for Reconsideration, but granted his Request for Certification.  This court granted Rivera's petition for permission to take an immediate appeal from the orders of the district court, and Rivera proceeded with this appeal.  The district court had jurisdiction pursuant to 28 U.S.C. § 1332.  We have jurisdiction pursuant to 28 U.S.C. § 1291.

**DISCUSSION**

---

[1]  Horsley also asserted a claim against Rivera for conspiracy to commit libel and slander, alleging that Rivera and several prominent people in the news media, government and political organizations participated in a conspiracy to defame him. The district court dismissed this claim, and its dismissal has not been appealed.

## I.    Standard of Review

We review *de novo* the district court's ruling on a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).  Cannon v. City of West Palm Beach, 250 F.3d 1299, 1301 (11th Cir. 2001).  Judgment on the pleadings under Rule 12(c) is appropriate when there are no material facts in dispute, and judgment may be rendered by considering the substance of the pleadings and any judicially noticed facts.  Hawthorne v. Mac Adjustment, Inc., 140 F.3d 1367, 1370 (11th Cir. 1998).   If upon reviewing the pleadings it is clear that the plaintiff would not be entitled to relief under any set of facts that could be proved consistent with the allegations, the court should dismiss the complaint.  White v. Lemacks, 183 F.3d 1253, 1255 (11th Cir. 1999).

## II.    Merits

Rivera contends that the district court erred in refusing to dismiss Horsley's complaint on the ground his statement that Horsley was "an accomplice to homicide" is protected under both the First Amendment and Georgia law as an imaginative and figurative expression that could not have been taken by a reasonable viewer of the Program as a literal assertion of facts.  For the reasons set forth below, we agree.

In assessing Horsley's claim, it is important to bear in mind that Horsley's

theory of defamation is that Rivera's comments "accused [him] of a felony," and that to falsely accuse him of being such a felon holds him up to "contempt, hatred, scorn, and ridicule in the eyes of the public and discredits [him] in the eyes of most law-abiding citizens." Having alleged that Rivera defamed him by stating that he is chargeable with a felony, Horsley is bound by that construction of Rivera's statements. See United States v. Tieco, Inc., 261 F.3d 1275, 1293 (11th Cir. 2001). It is in this context that we must consider Rivera's argument.

The First Amendment protections that apply in defamation claims are rooted in the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." New York Times v. Sullivan, 376 U.S. 254, 270 (1964). Consistent with this principle, both the Supreme Court and this Court of Appeals have long recognized that a defamation claim may not be actionable when the alleged defamatory statement is based on non-literal assertions of "fact." See, e.g., Letter's Carriers v. Austin, 418 U.S. 264, 284-86 (1974) (publication of pejorative definition of scab was not actionable in that use of words like "traitor" could not be construed as representations of fact); Greenbelt Coop. Publishing Ass'n v. Bresler, 398 U.S. 6, 13-14 (1970) (use of the term "blackmail," in characterizing negotiating position of a public figure who was seeking zoning variances while a city was attempting to acquire another tract from him, was not

"slander" when spoken in heated public meetings of city council or "libel" when reported in newspaper articles, inasmuch as it was impossible to believe that a listener or reader would think that a crime had been charged); Keller v. Miami Herald Publishing Co., 778 F.2d 711, 717 (11th Cir. 1985) (newspaper's editorial cartoon depicting persons resembling gangsters in a dilapidated building identified as a nursing home that had been closed by state order, and containing caption "Don't worry, Boss. We Can Always Reopen It As A Haunted House," was an expression of pure opinion and thus protected by the First Amendment).

More recently, the Supreme Court has clarified that the Constitution provides protection for "rhetorical hyperbole" that "cannot reasonably be interpreted as stating actual facts about an individual." Milkovich v. Lorain Journal Co., 497 U.S. 1, 20 (1990) (citing Hustler Magazine v. Falwell, 485 U.S. 46, 50, 53-55 (1987)). This provides assurance that public debate will not suffer for lack of "imaginative expression" or the "rhetorical hyperbole" which has traditionally added much to the discourse of our Nation. Id. This protection reflects "the reality that exaggeration and non-literal commentary have become an integral part of social discourse." Levisnky's, Inc. v. Wal-Mart Stores, Inc., 127 F.3d 122, 128 (1st Cir. 1997). This court has applied the rule articulated in Milkovich to find that a statement made by outside counsel representing a steel company that the conduct

11

of an equipment vendor, in filing an ethics complaint regarding an allegedly illegal investigation by the state attorney general's office and the steel company, was "the equivalent of Jeffrey Dahmer complaining his victims got blood on the carpet," could not reasonably be construed as defamatory in the sense that the vendor and its principal were comparable in some fashion to a convicted mass murder. See Tieco, 261 F.3d at 1293-94 (11th Cir. 2001).

In determining whether Rivera's statement is entitled to protection as rhetorical hyperbole, we must consider the circumstances in which the statement was expressed. Keller, 778 F.2d at 717. Examining the context surrounding the statement, we conclude that it consisted of the sort of loose, figurative language that no reasonable person would believe presented facts. A reasonable viewer would have understood Rivera's comments merely as expressing his belief that Horsley shared in the moral culpability for Dr. Slepian's death, not as a literal assertion that Horsley had, by his actions, committed a felony.

We base this determination on a number of observations. Most significant is that Horsley himself acknowledged that he understood Rivera to be speaking in a figurative rather than literal sense as soon as Rivera's statement was made, . As soon as Rivera stated "You are an accomplice to homicide, Mr. Horsley," Horsley retorted "You are too, because you're – you're showing exactly the same

information.... You're a collaborator just like I am, if that's true."  Based on this response, it is clear not only that Horsley believed that Rivera was speaking on a figurative level, but also that Horsley by his own statements was creating the impression on the audience that the dialogue was taking place on an animated, non-literal plane.  Accordingly, Horsley's response itself is contrary to his assertion that Rivera's viewers must have understood the statement as a literal assertion that Horsley could be criminally charged for his acts.

Additionally, other sections of the interview, such as the following exchange:  "Horsley:  I'm not pretending righteous – I've got blood of these children on my hands.  As a citizen of the United... Rivera:  You may have the blood of this doctor on your hands, Mr. Horsley" and Horsley's statement "It's not just babies who are at risk, Geraldo, my life is at risk.  Your life is at risk.  This whole nation's very existence is at risk" also instill upon a reasonable viewer the impression that the parties were exchanging dialogue at a non-literal level.  The fact that the parties were engaged in an emotional debate on a highly sensitive topic weighs in favor of the conclusion that a reasonable viewer would infer that Rivera's statement was more an expression of outrage than an accusation of fact.

In sum, it is clear from the record that Horsley and Rivera were engaged in an emotional debate concerning emotionally-charged issues of significant public

13

concern. Both Horsley and Rivera used non-literal, figurative language in expressing their views. When Rivera's statement is examined, as it must be, in its context of this debate, no reasonable viewer would have concluded that Rivera was literally contending that Horsley could be charged with a felony in connection with Dr. Slepian's murder. To the contrary, the record indicates that Rivera used those words only to convey the view that Horsley was morally responsible for Slepian's death. Therefore, the district court erred in ruling that Rivera's allegedly defamatory statement was not protected by the First Amendment as non-literal rhetorical hyperbole.[2]

Because we determine that Rivera's statement that Horsley was an accomplice to murder was protected by the First Amendment and by Georgia law as rhetorical hyperbole, we need not consider his claim that the statement was also

---

[2] In addition to enjoying First Amendment protection, Rivera's statement was also protected as hyperbolic expression under Georgia law, which similarly provides that the pivotal question in a defamation action is whether the challenged statement(s) can reasonably be interpreted as stating or implying defamatory facts. See, e.g., Jaillett v. Georgia Television Co., 520 S.E.2d 721, 725-26 (Ga. App. 1999) (television station which reported that an air conditioner repair business incorrectly told a homeowner that her entire unit needed to be replaced did not defame the business by virtue of reporter and anchor's use of the phrase "ripped off"); Webster v. Wilkins, 456 S.E.2d 699, 700 (Ga. App. 1995) (statements by the father of a child that he wanted to take the child from its mother and that "she's unfit to have a kid" did not rise to level of imputing any specific crime, debasing act, dishonesty, or immorality).

protected as an expression of opinion based on fully-disclosed facts.

## CONCLUSION

For the foregoing reasons, we reverse the orders of the district court denying Rivera's motion for judgment on the pleadings and motion for reconsideration. We remand the case to the district court with instructions to enter judgment in favor of Rivera.

REVERSED AND REMANDED.