Danny **FORTSON**, Plaintiff,

v.

Jerry **COLANGELO**, individually, the New York Post, a foreign corporation, and Peter Vecsey, individually, Defendants.

Nos. 04–61634 CIV, 04–61634 CIV.

United States District Court,
S.D. Florida.

June 5, 2006.

1370

Alexander Clark, Esq., Winston & Clark, P.A., Plantation, FL, for Plaintiff.

Anthony P. Strasius, Esq., Wilson Elser Moskowitz Edelman & Dicker LLP, Miami, FL, Slade R. Metcalf, Esq., Katherine M. Bolger, Esq., Hogan & Hartson LLP, New York City, Lori Piechura, Esq., Hogan & Hartson LLP, Miami, FL, for Defendants.

## MEMORANDUM OPINION AND ORDER GRANTING SUMMARY JUDGMENT

SELTZER, United States Magistrate Judge.

This cause is before the Court upon the Motion and Supporting Memorandum of Law of Defendant NYP Holdings, Inc.[1] for Summary Judgment (DE 27) and Defendant, Jerry Colangelo's Motion for Summary Judgment and Supporting Memorandum of Law (DE 45). The Motions were referred to the undersigned pursuant to the consent of the parties. Having carefully reviewed the papers in support of and in opposition to said Motions and being otherwise sufficiently advised in the premises, it is hereby ORDERED that the Motions are GRANTED.

## I. INTRODUCTION

On October 25, 2004, Plaintiff Danny Fortson filed a Complaint in the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida, asserting a slander claim against Jerry Colangelo and libel claims against the *New York Post* (hereinafter, the *"Post,"*) and Peter Vecsey.[2] *See* Complaint (Ex. A to Notice of

---

1. Defendant NYP Holdings, Inc. was incorrectly sued herein as "The New York Post."

2. Peter Vecsey was never served with the Complaint during the approximately 18 months that the case has been pending. Metcalf Decl. ¶ 7 (DE 32). However, because the *Post*'s alleged liability derives solely from its publication of Vecsey's Column, the evidence and arguments presented as to the *Post* libel claim are the same as would be presented as to the Vecsey libel claim. The bases for entering summary judgment as to the *Post* claim would therefore be the same as to the Vecsey claim. *See Artistic Entertainment, Inc. v. City of Warner Robins*, 331 F.3d 1196, 1201–02 (11th Cir.2003) ("[W]here a legal issue has been fully developed, and the evidentiary record is complete, summary judgment is entire-

Removal (DE 1)). Defendants thereafter removed the action to this Court.

The Complaint alleges that on November 26, 2003, Fortson, a professional basketball player for the Dallas Mavericks, pushed Phoenix Suns player Zarko Cabarkapa while defending a basket; the push resulted in Cabarkapa being thrown off balance, falling, and breaking his right wrist. *Id.* ¶¶ 8, 10, 11 (DE 1); Fortson's Statement of Undisputed Material Facts ¶ 4 (DE 40). The slander claim arises out of oral statements about Fortson made by Colangelo immediately following the game, and the libel claims arise out of written statements about Fortson made in a column by Vescey and published by the *Post* four days after the game.

Colangelo and the *Post* now move for summary judgment (DE 27 and 45, respectively). Fortson has responded to the motions (DE 41, 46), and Colangelo and the *Post* have replied thereto (DE 44, 48). The matter is now ripe for decision.

## II. *UNDISPUTED FACTS*

### A. *THE LITIGANTS*

Danny Fortson has played professional basketball for several National Basketball

Association ("NBA") teams since 1997. Fortson Dep. at 51. Fortson was playing for the Dallas Mavericks at the time of the incident giving rise to this action. *See 2004–05 Official NBA Guide* at 92, 166, 275, 290, 304, 315.[3]

By his own admission, Fortson has garnered a poor reputation for his physical style of play. In April 2003, he told a reporter for the *San Jose Mercury News:* "You get a reputation—on court, I don't back down from anybody .... So I guess people think I'm a bad guy. But I'm not a bad guy." Fortson Dep., Ex. 17. In August 2003, *The Dallas Morning News* published an article entitled, "Fortson Eager to Get on Court; He's Out to Prove His Reputation as a Bad Guy is Undeserved"; the article discussed Fortson's reputation as a "bad guy" and Fortson's seeming commitment to change that reputation. *Id.,* Ex. 19.

League statistics provide insight into the reasons for Fortson's reputation. During his career, Fortson has ranked among the league leaders in personal, technical, and flagrant fouls.[4] *See 2004–05 Official NBA Guide* at 92, 166, 275, 290, 304, 315. For example, during the 1998–99 season, Fortson led the league not only in personal

---

ly appropriate even if no formal notice has been provided.").

3. In the interest of brevity, the Court herein cites only to a particular deposition, deposition exhibit, or declaration, without referencing the document to which it is attached or the corresponding docket entry number. The Court, however, notes that the Declaration of Peter Vecsey is filed at docket entry 30 and that of Slade Metcalf is filed at docket entry 32. Attached to the Metcalf Declaration as Ex. C is the *2004–2005 Official NBA Guide: The Ultimate Season Reference Guide.* The deposition transcripts of Danny Fortson, Stuart Jackson, Jerry Colangelo, and Peter Vecsey are found at docket entry 42.

4. Stuart Jackson, the NBA's Senior Vice-President of Basketball Operations, explained the differences among personal, technical, and flagrant fouls. Jackson explained that a "personal foul is committed by a player that makes ... contact with another player on the floor and is judged by the official to be illegal contact." Jackson Dep. at 40. A technical foul "can be given as a disciplinary action ... or for multiple violations." *Id.* By contrast, a flagrant foul, level one is "contact that is adjudged unnecessary"; and a flagrant foul, level two is "contact by a player that is judged to be unnecessary and excessive." *Id.* at 43.

fouls (212), but also in game disqualifications (9). *Id.* at 166. In addition, Fortson has been fined significant sums and suspended (without pay) on repeated occasions.[5] Fortson has acknowledged committing "a lot of flagrant fouls over [his] career"; by his own admission, he has "collect[ed] rebounds as quickly as [he has] amassed fouls." Fortson Dep. at 173, 190. And Fortson has conceded that even before the foul on Cabarkapa, an individual considering his history of flagrant fouls and fines could conclude that he is a "rough player." *Id.* at 386.

At all pertinent times, Colangelo was the Chairman and CEO ("owner") of the Phoenix Suns. *See* Colangelo Dep. at 7. Colangelo has 40 years of professional basketball experience as a player, coach, and manager. *Id.* at 54. As an owner, Colangelo has served as Chairman of the NBA Board of Governors, as well as Chairman of the Rules Committee. *Id.* at 23, 29.

Defendant NYP Holdings, Inc. is the publisher of the *Post*, a daily newspaper distributed primarily in the New York metropolitan area. *See* Post's Motion at 1, 6 (DE 27); Vecsey Decl. ¶ 1. At the time of the events giving rise to the Complaint, Peter Vecsey was the NBA columnist for the *Post*. Vecsey has more than 40 years' experience as a professional sports journalist; for most of that time he has covered professional basketball exclusively. In addition to writing for the *Post*, Vecsey has written for the *New York Daily News* and for *USA Today*. Vecsey Decl. ¶¶ 7–11. Vecsey has also worked as a television and radio commentator; he has provided on-air commentary for NBA games, anchored half-time shows, and moderated NBA-related programs for several networks, including: CBS, NBC, Turner Network Television, Fox Sports Network, SportsChannel, USA Network, Madison Square Garden Network, NBA Entertainment Television, and ESPN radio. *Id.* ¶¶ 12–23.

At the *Post*, Vecsey writes a column[6] (the "Column") entitled "Hoop du Jour" three times a week during the professional basketball season. *Id.* ¶¶ 30–31. Vecsey explains that the Column "is dedicated to [his] thoughts, opinions, and reactions regarding the league" and "is meant to enlighten and entertain readers." *Id.* ¶ 31. Vecsey describes his style as "colloquial and informal"; he "often us[es] slang

---

5. Examples of such fines and suspensions include: (1) January 31, 1998—flagrant foul, level two and $5,000 fine for a rough tackle on Shawn Bradley. DVD annexed to Metcalf Decl., Ex. D at Ex. 4; Fortson Dep., Ex. 6; (2) January 2, 2002—flagrant foul, level two and $1,000 fine for elbowing Brian Skinner in the head. *Id.* at Ex. 9; (3) March 14, 2002—flagrant foul, level two, $5,000 fine and two game suspension (costing more than $100,000 in salary) for grabbing Shaquille O'Neal around the throat and (in the same game) flagrantly fouling Rick Fox. *Id.* at 106 and Exs. 12, 14; (4) March 29, 2002—flagrant foul and two game suspension (costing more than $100,000 in salary) for fouling Ben Wallace. *Id.* at 124–25 and Exs. 15, 16; (5) November 26, 2003—flagrant foul, level two and three game suspension for destabilizing Zarko Cabarkapa in mid-air (the instant matter). *See* discussion *infra* at Part II.B; and (6) February 10, 2005—two game suspension for throwing a chair into the air following a game ejection, which, in turn, followed a verbal altercation with Chris Webber; incident resulted in Jackson speaking to Fortson's coaches and team management about his over-aggressive style of play. Jackson Dep. at 219–20, 223–24; Fortson Dep. at 217–220, 229, 236–37 and Ex. 43.

6. A newspaper "article generally reports hard news in an objective fashion ...." Vecsey Decl. ¶ 9. By contrast, a newspaper "column contains the thoughts and opinions of the writer." *Id.*

terms as they are used by basketball players and avid basketball fans." *Id.* ¶ 52. And he uses language that is deliberately hyperbolic to convey his strongly held opinions. *Id.* ¶ 56. Vecsey is frequently critical of NBA management, and his criticism is sometimes directed at the NBA's discipline of players for fouls or misconduct. *Id.* ¶ 32; *see also id.* ¶¶ 33, 35, 36, 37 (sampling of articles directed to league's disciplinarians and disciplinary decisions).

## B. *THE FLAGRANT FOUL AND ITS FALLOUT*

On November 26, 2003, the Mavericks and the Suns met in an NBA game. As reported by game officials, with slightly less than 3 minutes remaining and the Suns holding a 24–point lead, Suns rookie Zarko Cabarkapa received the ball on a fast break and elevated to the basket. While Cabarkapa was in the air, Fortson extended his arms and (without making any effort to play the ball) pushed Cabarkapa on the chest, knocking him to the ground. The Suns rookie landed on and

broke his right wrist; the injury sidelined Cabarkapa for a considerable period of time.[7] Fortson was immediately called for a flagrant foul (level two), ejected from the game, and escorted by security personnel out of the arena.[8] In addition, the league fined Fortson $1,000 and suspended him for three games without pay, a suspension that by NBA standards is "on the high side." Fortson Dep., Ex. 31; Jackson Dep. at 119–20. The three-game suspension without pay cost Fortson $198,606. Fortson Dep. at 181.

Fortson offered this account of the foul:

Well, first of all, I shouldn't have been in the game at that particular moment. Was like two, three minutes left, the game was over. I'm not loose and I was on a—we were one—I was on the bench, the game was already decided. And running back on defense and I, I don't know, the ball went over the top of my head, I don't know, guarding my man, I happened to turn around and look and this guy is flying in the air. I have no choice but to put my hands out to stop him from jumping over the top of me or,

---

7. A replay of Fortson's flagrant foul from several different camera angles can be seen clearly on a DVD annexed to the Metcalf Decl., Ex. D at Ex. 22.

8. Colangelo filed the reports that the three game referees had submitted to the league office, which set forth their accounts of the events leading to the foul call and the Fortson ejection. *See* Referee Statements (attached as Ex. C to Colangelo Motion (DE 45)). Referee Bill Spooner reported: "At 2:58 of the 4th Qtr. Phoenix player Zarko Cabarkapa drove to the basket, and was in mid-air when Dallas player Danny Fortson pushed him in the chest very forcefully and knocked him to the ground. Phoenix was leading at the time 112–88. The flagrant foul was excessive and was called a flagrant penalty (2). Fortson was ejected." *Id.* Referee Gary Benson stat-

ed: "With 02:58 remaining in the fourth quarter from the trail position, I observe[d] Danny Fortson (Dallas) flagrantly foul penalty two Zarko Cabarkapa (Phoenix). Cabarkapa was making a drive to the basket and while in the air, Fortson pushed Cabarkapa without making any attempt to play the ball. The contact was unnecessary and excessive. The score was Phoenix leading 112–88. Bill Spooner ejected Fortson. Cabarkapa was injured and could not further participate .... We learned after the game that Cabarkapa had broken a bone in his arm/wrist." *Id.* And Referee Joe Forte described the incident: "Fortson defending the play puts both hands into the chest of Cabarkapa while in the air and commits the FFP2. The actions of Fortson were unnecessary and considering the game time and score very excessive. Therefore the ejection." *Id.*

you know, stop him from the layup or the dunk or whatever he was doing. The guy being so light, any little thing that I did, he's going to bounce off me and he just landed pretty bad.

Fortson Dep. at 151. When asked in a follow-up question whether he had "pushed Zarko [Cabarkapa] to the floor," Fortson responded: "The way it looked, maybe. But for me personally, I thought I just was trying to push him to stop him from, you know, making a basketball play. But it wasn't—the push wasn't, you know, intentionally trying to hurt anybody." *Id.* at 162. Fortson, however, did acknowledge that it was "a bad play" and that he "knew it could be ugly" when he put his hands on Cabarkapa. And he apologized, adding: "I wouldn't want to be hit like that." *Id.* at 175 (affirming statement in newspaper article).

Following the game, Colangelo stated of Fortson: "He's a thug. He always has been and is." Fortson Dep., Ex. 23. Colangelo further remarked: "He should be put down for every day that [Cabarkapa] is out. I'll do everything in my power to see that happens. With the game over, there's no excuse for that." *Id.,* Ex. 23.[9] Colangelo's statements were broadcast and published by the media. Fortson's Response at 2 (DE 46). In the days that followed the incident, television stations throughout the country showed video footage of the incident, and the print media reported on it as well. *See* Vecsey Decl. ¶ 46. The incident triggered outrage not only in the teams' home-town newspapers, *see The Fort Worth Star Telegram* and

*The Arizona Republic* articles attached as Exs. 25 and 27 to Fortson Dep., but in out-of-town newspapers as well. Writing in the *New York Post* a few days later, Vecsey spoke out about the incident and, in particular, what he considered to be the NBA's inadequate response to Fortson's foul. Vecsey's November 30, 2003 Column, entitled "Stern Warnings Are Not Enough," expressed his view that NBA Commissioner David Stern should have suspended Fortson for the same amount of time that Cabarkapa required to heal. *See* Column, attached hereto as Ex. A. This viewpoint appears beneath a photograph of Cabarkapa after the foul as he lay on the floor writhing in pain. *See id.* The photograph is accompanied by a caption that summarizes the pertinent facts. *See id.* The Column contains the following passages, which include the allegedly defamatory words (underlined below):[10]

1. As long as *thugged out* players are permitted to recklessly endanger the limbs and lives of helpless opponents without being suitably punished, David Stern's puffed-up campaign to eradicate violence from the NBA is a charade. ("Statement A.")

2. There's only one fool-proof method to prevent *vacant lots* like Danny Fortson from randomly *mugging* defenseless rivals like Zarko Cabarkapa: Suspend his *meaningless mass* for as long as it takes the broken right wrist of the Suns rookie to heal completely. ("Statement B" and "Statement C.")

3. Why should other gangstas or wankstas be the least bit subdued

---

**9.** Fortson's own coach, Don Nelson, publicly stated of the foul: "There's no place for that in the game." Fortson Dep., Ex. 25.

**10.** The specific words of which Fortson complains are underlined herein. Each passage

is then followed by a reference—"Statement ___"—to the lettered sub-paragraph of Paragraph 20 of the Complaint, in which the allegedly defamatory words are cited.

about submarining a superstar if Fortson is eligible to maim and mangle for the Mavericks a week from now while his victim is shelved six-to-eight? ("Statement D" and "Statement E.")

4. After 25 years of rule, can it be Stern (and obtuse advisers) still doesn't grasp the potential danger of *maliciously destabilizing a player in mid-flight?* Can it be the commissioner doesn't comprehend that Cabarkapa could've been injured far more seriously late in the fourth quarter of a 30–point Phoenix blowout when Fortson *maliciously shoved* him with two hands while he was airborne? ("Statement F" and "Statement G.")

5. What's he saying? *Attempted murder* is no problem; you have to murder somebody on one of my courts before I'll outlaw the brazen disregard for the safety of the susceptible? ("Statement H.")

*See id.* (emphasis added).

## III. *STANDARD OF REVIEW*

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment where the pleadings and supporting materials show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. An issue is "genuine" if a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if it must be decided to resolve the substantive claim or defense to which the motion is directed. *Id.; Hairston v. Gainesville Sun Publ'g Co.,* 9 F.3d 913, 919 (11th Cir.1993).

The moving party bears the burden of establishing the absence of a genuine issue as to any material fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Once the movant has satisfied its initial burden, the non-moving party must then go beyond the pleadings to rebut any facts properly presented; it may do so through affidavits or other evidence showing the existence of genuine issues of material fact for trial. Fed.R.Civ.P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Adickes,* 398 U.S. at 160, 90 S.Ct. 1598.

Summary judgment is appropriate when, after adequate time for discovery, the non-moving party cannot establish an essential element on which it bears the burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Id.; accord Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1080 (11th Cir.1990).

In considering the motion, the Court must construe the evidence and the inferences drawn from the underlying facts in the light most favorable to the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Furthermore, facts asserted by the party opposing summary judgment must generally be regarded as true if supported by affidavit or other evidentiary material. *Coke v. Gen. Adjustment Bureau, Inc.,* 640 F.2d 584, 595 (5th Cir.1981) (quoting 10C Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2727 at 524–30 (1973)).

## 1378

### IV. *LEGAL FRAMEWORK*

■ Fortson alleges the common-law torts of slander and libel against Colangelo and the *Post,* respectively.[11] "To recover for libel or slander under Florida law, a plaintiff must demonstrate that: 1.) the defendant published a false statement; 2.) about the plaintiff; 3.) to a third party; and 4.) the [plaintiff] suffered damages as a result of the publication." *Thompson v. Orange Lake Country Club, Inc.,* 224 F.Supp.2d 1368, 1376 (M.D.Fla.2002) (citing *Valencia v. Citibank Int'l,* 728 So.2d 330, 330 (Fla. 3d DCA 1999)). The first element of the claim, "[a] false statement of fact[,] is the *sine qua non* for recovery in a defamation action." *See Hallmark Builders, Inc. v. Gaylord Broad., Co.,* 733 F.2d 1461, 1464 (11th Cir.1984) (quoting *Byrd v. Hustler Magazine, Inc.,* 433 So.2d 593, 595 (Fla. 4th DCA 1983)); *see also Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 23, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) (Brennan, J., dissenting) ("I agree with the Court that ... only statements that are capable of being proved false are subject to liability under state libel law").

■ Here, Fortson argues that the complained of words are false statements of fact, whereas Colangelo and the *Post* argue that the words are not statements of fact, but rather expressions of opinion, more specifically, pure opinion and/or rhetorical hyperbole. "Pure opinion occurs when the defendant makes a comment or opinion based on facts which are set forth in the article or which are otherwise known or available to the reader or listener as a member of the public." *From v. Tallahassee Democrat, Inc.,* 400 So.2d 52, 57 (Fla. 1st DCA 1981); *see also* Restatement (Second) of Torts § 566 (1977) (describing pure opinion as "a comment as to the plaintiff's conduct, qualifications or character"). "Pure opinion is sometimes characterized as 'rhetorical hyperbole.' " Laura G. Pula et al., *Florida Torts* § 25.03 (2006). The Supreme Court has used various phrases to describe "rhetorical hyperbole," including "imaginative expression" and "loose, figurative, or hyperbolic language."[12] Although rhetorically hyperbolic statements may "at first blush appear to be factual[,] ... they cannot reasonably be

---

**11.** "Under Florida law, words are defamatory when they charge a person with an infamous crime or tend to subject one to hatred, distrust, ridicule, contempt or disgrace or tend to injure one in one's business or reputation." *Seropian v. Forman,* 652 So.2d 490, 495 (Fla. 4th DCA 1995) (citation omitted). "[D]efamation encompasses both libel and slander ...." *IBP, Inc. v. Hady Enters., Inc.,* 267 F.Supp.2d 1148, 1163 (N.D.Fla.2002) (citation omitted) (applying Florida law). "Slander" is ordinarily confined to defamatory spoken words, whereas "libel" pertains to defamatory written statements. *See Dunn v. Air Line Pilots Ass'n,* 193 F.3d 1185, 1191 (11th Cir.1999) (citation omitted) ("Under Florida law, libel is defined as the unprivileged written publication of false statements ...."); *Spears v. Albertson's, Inc.,* 848 So.2d 1176, 1179 (Fla. 1st DCA 2003) ("Slander may be defined as the speaking of base and defamatory words ...."); *see also Prosser and Keeton on The Law of Torts* § 111 (5th ed.1984).

Fortson titled Count I of the Complaint "Defamation as to Jerry Colangelo"; and he titled Count II "Libel as to the New York Post" and Count III "Libel as to Peter Vecsey." Count I, however, is mistitled. Because Count I alleges that Colangelo spoke the allegedly defamatory words, that count is more properly titled as one for "slander," and the Court has construed it as such. Notwithstanding the particulars of the title, the elements of libel and slander—defamation—are the same.

**12.** *See, e.g., Milkovich,* 497 U.S. at 20–21, 110 S.Ct. 2695 ("imaginative expression"; "loose, figurative, or hyperbolic language"); *Letter Carriers v. Austin,* 418 U.S. 264, 285–86, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974) ("lusty and imaginative expression"); *Greenbelt Coop. Publ'g Ass'n. v. Bresler,* 398 U.S. 6, 14, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970) ("vigorous epithet").

interpreted as stating actual facts about their target." *Standing Comm. on Discipline of U.S. Dist. Court for Cent. Dist. of Cal. v. Yagman,* 55 F.3d 1430, 1438 (9th Cir.1995); *accord Milkovich,* 497 U.S. at 20, 110 S.Ct. 2695 (noting protection accorded "statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual"). Where rhetorical hyperbole is employed, the language itself "negate[s] the impression that the writer was seriously maintaining that [the plaintiff] committed the [particular act forming the basis of the alleged defamation]." *Id.* at 21, 110 S.Ct. 2695.[13] The distinction between fact and pure opinion/rhetorical hyperbole is a critical one; to be actionable, a defamatory publication must convey to a reasonable reader the impression that it describes actual facts about the plaintiff or the activities in which he participated. *See Ford v. Rowland,* 562 So.2d 731, 735 (Fla. 5th DCA 1990).

 It is for the Court to decide, as a matter of law, whether the complained of words are actionable expressions of fact or non-actionable expressions of pure opinion and/or rhetorical hyperbole. *See Colodny v. Iverson, Yoakum, Papiano & Hatch,* 936 F.Supp. 917, 923 (M.D.Fla.1996) ("[W]hether the alleged defamatory word

is a[ ] non-actionable expression of pure opinion or an actionable expression of pure fact . . . is a question of law for the Court.") (citing Florida cases). In determining whether an allegedly defamatory statement is an expression of fact or an expression of pure opinion and/or rhetorical hyperbole, context is paramount:

> [T]he test to be applied in determining whether an allegedly defamatory statement constitutes an actionable statement of fact requires that the court examine the statement in its totality and the context in which it was uttered or published. The court must consider all the words used, not merely a particular phrase or sentence. In addition, the court must give weight to cautionary terms used by the person publishing the statement. Finally, the court must consider all of the circumstances surrounding the statement, including the medium by which the statement is disseminated and the audience to which it is published.

*From,* 400 So.2d at 57 (citation and internal quotations omitted); *accord Horsley v. Rivera,* 292 F.3d 695, 702 (11th Cir.2002) ("In determining whether [the defendant's] statement is entitled to protection as rhetorical hyperbole, we must consider the

---

**13.** A court examining challenged words in a libel or slander action can conclude that the statement is one of non-actionable pure opinion (as Colangelo and the *Post* argue) or that the statement is one of actionable fact (as Fortson argues). A third conclusion at which a court could arrive, which also would be actionable, is that the statement is one of mixed opinion and fact. "Mixed opinion is based upon facts regarding a person or his conduct that are neither stated in the publication nor assumed to exist by a party exposed to the communication. Rather, the communicator implies that a concealed or undisclosed set of defamatory facts would confirm his opinion." *See LRX, Inc., v. Horizon Assocs. Joint Venture ex rel. Horizon–ANF, Inc.,* 842

So.2d 881, 885 (Fla. 4th DCA 2003). Fortson, however, did not argue that any of the challenged statements were mixed opinion and fact, nor could this Court so conclude. The facts giving rise to the allegedly defamatory remarks—Fortson's actions in fouling Cabarkapa—were widely publicized in the print and electronic media; and they were also summarized in the caption of the photograph accompanying the Column. Because the pertinent facts were available or known to the readers and listeners, neither Colangelo's nor Vecsey's statements can be deemed mixed opinion.

circumstances in which the statement was expressed.").

## V. ANALYSIS

### A. THE COLANGELO STATEMENTS

■ Fortson alleges that Colangelo slandered him following the November 26 game by stating that Fortson is "a thug and I want him out of here" and that Fortson has "always been a thug." Complaint ¶¶ 13, 14 (DE 1). According to Fortson: "An average reader or listener or member of the public could easily draw the conclusion from Colangelo's statement that Danny Fortson was in fact a 'thug' as used in the common dictionary definition of the word (the Random House Webster Collegiate Dictionary) defines '[T]hug' as, '[A] vicious criminal or ruffian.' Id. (Sixth Edition page 1392) ...." Fortson's Response at 5–6 (DE 46). Colangelo counters that although he uttered the challenged words in anger shortly after witnessing the injury to his player—a "heat of the moment response ... to what had transpired"—his words are nonetheless protected expressions of opinion. Colangelo Dep at 10; Colangelo Motion at 1–2 (DE 45).

Preliminarily, the Court notes that at least one court has held that calling an individual a "thug" is not defamatory. In *Garrett v. Kneass*, 482 So.2d 876, 879 (La.

Ct.App.1986), the court held that " 'thug' is a name that does not impute any particular crime to the plaintiff." Certainly in the instant context, this Court would agree that the term "thug" cannot be construed as imputing any particular crime to Fortson. According to Vecsey, the term "thug" is frequently used in the basketball community to refer to those players who try to intimidate people by acting tough. *See* Vecsey Decl. ¶¶ 56, 57. Indeed, by Fortson's own admission, he plays a "physical game of basketball" and is "an enforcer on [his] team." [14] Fortson Dep. at 349, 351.

Further, given Fortson's well-publicized history of overly aggressive play (fouls, ejections, fines, and suspensions), coupled with the tone and timing of allegedly defamatory remarks (an angry remark following a game in which Fortson sidelined a Suns player for an extended period), no reasonable listener could conclude that Colangelo's invocation of the term "thug" was anything but hyperbolic. *See Horsley v. Feldt*, 304 F.3d 1125, 1132 (11th Cir.2002) (noting that heated nature of discussion and its temporal proximity to traumatic event as factors probative of rhetorical hyperbole).[15] The term conveyed Colangelo's opinion—predicated on personal observation and 40 years of professional basketball experience—of Fortson's inappropriate style of play. Significantly, Colangelo did not imply that he

---

14. In describing himself as an "enforcer," Fortson clearly did not intend the term, and it could not reasonably have been understood, to suggest that he is a violent agent—an "enforcer"—for a criminal enterprise. Indeed, by invoking the term, Fortson illustrates the rebuttal to his argument: the meaning of a word—be it "enforcer" or "thug"—is contextually driven, taking on a certain meaning when invoked in one context, such as lawful athletic activity, and a very different meaning

when invoked in another, such as unlawful criminal activity.

15. Even Fortson acknowledged that when Colangelo made the statement—"[w]ithin minutes" after the game—he was "livid" and "[f]urious" because he is "the owner of the team" and "[t]his is his investment." Fortson Dep. at 371–72.

had access to any facts beyond those that were already known to the basketball audience. *See id.* at 1133 (citing undisputed nature of facts in support of finding protected speech). To paraphrase the *Feldt* court: "[T]he inflammatory words that [Colangelo] used hyperbolically accused [Fortson] only of that actual conduct" that the audience had already witnessed. *Id.* In that context, no reasonable listener of any sports program that broadcast Colangelo's statement, and no reasonable reader of any sports section that printed it, could draw the inference suggested by Fortson—"that he was a vicious criminal of some sort." Fortson's Memorandum at 5–6 (DE 46).

### B. THE VECSEY STATEMENTS

1. *The context in which the statements were published undermines Fortson's claim.*

The context in which the Vecsey statements were published is of critical import. Fortson would have the *Post* held liable for statements in Vecsey's "Hoop du Jour" Column (not in an article), which appears regularly in the newspaper's sports section. The Column holds itself out as containing subjective content and is a vehicle through which basketball fans can read of Vecsey's thoughts and opinions on the NBA. Because the challenged statements were made through a medium that fosters debate on basketball issues and that routinely uses figurative or hyperbolic language, a reasonable reader is more likely to regard its content as opinion and/or

rhetorical hyperbole. *See, e.g., Colodny,* 936 F.Supp. at 924 (holding that statement published in "Commentary section" of newspaper is opinion); *Hay v. Indep. Newspapers, Inc.,* 450 So.2d 293, 295 (Fla. 2d DCA 1984) (statements in letter to editor published in newspaper section entitled "The Forum, Opinion," were statements of opinion).[16] Indeed, courts have recognized that sports commentaries in particular are likely to contain statements of opinion, rather than fact, because they serve as a "traditional haven for cajoling, invective, and hyperbole." *Stepien v. Franklin,* 39 Ohio App.3d 47, 528 N.E.2d 1324, 1329 (1988) (citations and internal quotations omitted); *accord Time, Inc. v. Johnston,* 448 F.2d 378 (4th Cir.1971) (noting that term "destroyed," as applied to opposing basketball player, was mere hyperbole).

■ Further, the issue that the Column sought to address—the (in)adequacy of the NBA's response to violent fouls—is a controversial one about which there has been ongoing debate. Here, Vecsey took NBA Commissioner David Stern to task for suspending Fortson for only three games, while Cabarkapa would be sidelined for a far longer period of time. Vecsey's solution, also articulated by Colangelo following the game, was to suspend Fortson and similar offenders for as long as it took their victims to heal, a proposal opposed by many in the league. *See* Colangelo Dep. at 26–28. Where an issue is controversial, evoking strongly held views, statements relating thereto are more likely to be deemed rhetorical hyperbole. *See, e.g., Old Dominion Branch No. 496 v.*

---

**16.** That Vecsey is a well-known basketball commentator makes it even more likely that his readers would expect his Column to be laced with opinion. *See Riley v. Moyed,* 529 A.2d 248, 252 (Del.1987) (finding that challenged statements were rhetorical hyperbole, in part, because defendant, a long-time writer-commentator for newspaper, was "a well-known professional provocateur who relie[d] on heavy sarcasm to create controversy or convey a message.").

*Austin,* 418 U.S. 264, 284, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974) ("strong disagreement" between union members and opponents of unionization supported finding that challenged statements were protected).

And, the placement and timing of the challenged words undermine Fortson's contention that they could reasonably be read as assertions of fact. The Column appears under the headline, "Stern Warnings Not Enough." Above the headline appears a photograph of the injured Cabarkapa, grasping his wrist and writhing in pain. The caption under the photograph states: "SLAP ON THE WRIST: Suns Forward Zarko Cabarkapa broke wrist after flagrant foul by Mavericks' Danny Fortson on Wednesday. Fortson got three-game suspension. Cabarkapa could be out up to eight weeks." *See Byrd,* 433 So.2d at 595 ("When words and pictures are presented together, each is an important element of what, *in toto,* constitutes the publication."). Hence, the facts that form the basis of Vecsey's Column— that Fortson flagrantly fouled Cabarkapa, broke Cabarkapa's wrist, sidelined Cabarkapa for up to eight weeks, and received a three game suspension—are set forth in the caption. Moreover, those facts had already been widely disseminated through the print and electronic media in the days immediately following the incident. *See, e.g.,* Fortson Dep., Exs. 23, 25–28. Because Vecsey's commentary was predicated on facts set forth in the caption and/or otherwise known or available to the basketball community, it falls squarely within the legal definition of pure opinion. *See From,* 400 So.2d at 57 (defining "pure opinion").

### 2. The statements themselves are not defamatory.

 Fortson alleges that the *Post* libeled him through eight statements in the Vecsey Column. Statement A is Vecsey's reference to Fortson as a "thugged out" player.[17] According to Fortson:

> [T]he nexus between the physical activity on the court and the characterization of Fortson leaves a reader with the clear understanding that Fortson is a thug ... in his off the court life. Thugs ... do not exist on NBA courts—they are found on street corners threatening, robbing and injuring citizens. The clear meaning of Vecsey's comments are that after taking off his basketball uniform, Plaintiff engages in physically violent criminal activity.

Fortson's Memorandum at 4–5 (DE 41). The Court does not agree. "Thugged out" is a slang phrase that Vecsey invoked in reference to those players (including Fortson) who he believes try to act tough and intimidate players on the court. *See Gold v. Harrison,* 88 Hawai'i 94, 962 P.2d 353, 360–62 (1998) (finding in favor of defendant who had used term "rape" in its non-literal, slang sense to convey feelings about court awarding easement over his property); *see also Mr. Chow of N.Y. v. Ste. Jour Azur S.A.,* 759 F.2d 219, 226 (2d Cir.1985) (stating that courts "must ... look at the language itself to determine if it is used in a precise, literal manner or in a loose, figurative or hyperbolic sense"). And when "thugged out" is read against the backdrop of the broader context in which it appears, no reasonable reader of Vecsey's Column would construe "thugged

---

**17.** For ease of reference, the passage in which the complained of words appear is repeated: "As long as *thugged out* players are permitted to recklessly endanger the limbs and lives of helpless opponents without being suitably punished, David Stern's puffed-up campaign to eradicate violence from the NBA is a charade."

out" in its literal sense—robbing helpless individuals on street corners—as Fortson suggests. Vecsey clearly indulged in rhetorical hyperbole, and his language is therefore protected.

■ Statement B is Vecsey's reference to Fortson as a "vacant lot" and an individual that needs to be stopped from "mugging" defenseless rivals.[18] Vecsey's use of the phrase "vacant lot" cannot conceivably be read as a statement of fact—that Fortson is what the statement literally describes, an unimproved parcel of real property. By describing Fortson in terms that are not physically possible, Vecsey's phrase negates any implication that he is actually asserting facts. *See Pring v. Penthouse Int'l, Ltd.*, 695 F.2d 438, 443 (10th Cir.1983) (holding that article was rhetorical hyperbole because it described physical impossibility). Vecsey simply used colorful language—invective—to denounce Fortson; and Vecsey's readership could not have interpreted it any other way. Similarly, no reasonable person would take Vecsey's passage about the need to prevent Fortson "from randomly mugging defenseless rivals like Zarko Cabarkapa" to be an assertion of fact about off-the-court criminal activity. Rather, Vecsey exercised his constitutional prerogative to invoke slang—"mugging"—in lieu of a more literal phrase to describe the manner in which Fortson knocked Cabarkapa to the ground. *See Moldea v. N.Y. Times Co.*, 22 F.3d 310, 313–14 (D.C.Cir. 1994) ("Sports columnists frequently offer intemperate denunciations of coaches' play-calling or strategy, and readers know

this and presumably take such railings with a grain of salt . . . .").

In Statement C, Vecsey called upon the league to "[s]uspend [Fortson's] *meaningless mass* for as long as it takes" Cabarkapa's wrist to heal. As used here, the phrase "meaningless mass" was nothing more than an epithet, invoked by Vecsey to express his contempt for Fortson and his tactics. Like the phrase "vacant lot," "meaningless mass" cannot reasonably be read as an actual assertion of fact, the *sine qua non* of a libel claim. *See Haberstroh v. Crain Publ'ns, Inc.*, 189 Ill.App.3d 267, 136 Ill.Dec. 771, 545 N.E.2d 295, 298–99 (1989) (holding that challenged language was non-actionable "name-calling"). Even Fortson acknowledged that, to him, the phrase "meaningless mass" simply means "[s]omebody that's just a big nothing. A vacant lot, so to speak." Fortson Dep. at 314.

■ Statement D—"gangstas or wankstas"[19]—are descriptive terms that Vecsey, by implication, applied to Fortson. As he did with respect to the term "thug," Fortson argues that the phrase "gangstas or wankstas" is defamatory because "gangsters do not exist on NBA courts—they are found on street corners threatening, robbing and injuring citizens." Fortson's Memorandum at 4–5 (DE 41). However, a "gangsta" is not a "gangster"; it is a slang term from the world of Hip–Hop. *See* Vecsey Decl. ¶ 60. As Vecsey explained, he used the terms "gangsta and wanksta" as they are defined in that world: "[a] gangsta is someone [who] walks with a

---

18. "There's only one fool-proof method to prevent *vacant lots* like Danny Fortson from randomly *mugging* defenseless rivals like Zarko Cabarkapa: Suspend his *meaningless mass* for as long as it takes the broken right wrist of the Suns rookie to heal completely."

19. "Why should other *gangstas* or *wankstas* be the least bit subdued about submarining a superstar if Fortson is eligible to *maim and mangle* for the Mavericks a week from now while his victim is shelved six-to-eight?"

swagger, talks 'smack' on the court and acts tough"; "[a] wanksta on the other hand, is a want-to-be-gangsta." *Id.*

But even without the benefit of Vecsey's (post-filing) explanations and definitions, a contextual reading of the passage does not support an inference that Fortson was an actual gangster—a member of a criminal enterprise or otherwise engaged in a life of crime. Rather, Vecsey asked rhetorically why NBA players who might be similarly inclined to engage in overly aggressive tactics—players whom he labels "gangstas or wankstas"—would be deterred from harming other players when they see that the NBA suspended Fortson for far less time than would be required for Cabarkapa to heal.

Statement E—"maim[ing] and mangl[ing]"—are additional terms that Fortson alleges to be libelous. As he did with the term "mugging," Vecsey chose slang—"maim[ing] and mangl[ing]"—to express his opinion of Fortson's inappropriate style of play—committing hard fouls and intimidating opponents.

▆▆▆ Statement F—"maliciously destabilizing a player in mid-flight" [20]—and Statement G—"maliciously shoved"—are additional phrases that Fortson alleges to be libelous. Although Fortson maintains that his actions were inadvertent, he does acknowledge that he "pushed" Cabarkapa, *see* Fortson Dep. at 162, which knocked Cabarkapa to the ground and broke his wrist. Fortson takes issue only with Vecsey's use of the terms "maliciously" and "shove[d]." [21] *See id.* at 162–63, 322, 324–25, 361. Yet, Vecsey had ample facts upon which to opine that Fortson acted "maliciously" and "shoved" Cabarkapa: Fortson is an experienced (and frequently sanctioned) professional who (admittedly) understands the danger of using two hands to push an opposing player in mid-air, *see* Fortson Dep. at 362; Fortson made no visible effort to block the ball; Fortson broke Cabarkapa's wrist; and Fortson's pushing Cabarkapa on the chest could not have served any legitimate purpose, particularly given the scant time remaining and the Suns' insurmountable lead. By invoking the terms "maliciously" and "shoved" to characterize Fortson's actions, Vecsey merely offered readers his judgment—albeit, a harsh one—based upon facts that were known or available to them. Vecsey's language, therefore, was nothing more than a textbook expression of pure opinion.

▆▆▆ Statement H—"attempted murder" [22]—is the final phrase with which Fortson takes issue. Fortson argues that "the average reader can very easily draw the inference from the article that Plaintiff

---

**20.** "After 25 years of rule, can it be Stern (and obtuse advisers) still doesn't grasp the potential danger of *maliciously destabilizing* a player in mid-flight? Can it be the commissioner doesn't comprehend that Cabarkapa could've been injured far more seriously late in the fourth quarter of a 30–point Phoenix blowout when Fortson *maliciously shoved* him with two hands while he was airborne?"

**21.** When asked during his deposition whether he "destabilized" Cabarkapa, Fortson appeared to agree, yet equivocated: "Okay, yeah. He was flying and he went a different direction once he bounced off my arms. So if you want to say that's destabilizing, then that's——[Vecsey] could use a little better wording ... than that." Fortson Dep. at 323 (dashes in original transcript).

**22.** "What's he saying? *Attempted murder* is no problem; you have to murder somebody on one of my courts before I'll outlaw the brazen disregard for the safety of the susceptible?"

was *actually trying to kill* another player." Fortson's Memorandum at 5 (DE 41) (italics in original).[23] The Court does not agree. Fortson's assumption that reasonable people read words in a vacuum, according to their dictionary definition, is ill-founded. As the law recognizes, reasonable people read words contextually. *See, e.g., Rivera,* 292 F.3d at 702. And as reasonable people read the Vecsey Column, they do so mindful of the events upon which the Column is based. Hence, reasonable readers of the Vecsey Column were no more likely to have believed that Fortson had actually tried to kill Cabarkapa than reasonable readers of the late 1920s were to have believed that "Murderer's Row"—Ruth, Gehrig, and their Yankee teammates—had actually slayed opposing pitchers. In Fortson's context, as with the Yankee legends, the term "murder" was obviously applied hyperbolically; and it was understood by the reasonable reader in that manner.

---

**23.** It is arguable whether Vecsey was using the phrase "attempted murder" to describe Fortson's foul. But for purposes of the instant Motions, the Court will assume that to be so.

## VI. CONCLUSION

As in *Johnston,* Colangelo and Vecsey invoked "phrases of some vividness, used them in a figurative, not literal, sense, [and they] used a form of hyperbole typical in sports parlance." 448 F.2d at 384. To foreclose the use of hyperbole, under the threat of civil liability, "would condemn [sports commentary] to an arid, desiccated recital of bare facts." *Id.* Such a result would ill-serve the interests of the First Amendment in "assur[ing][the] unfettered interchange of ideas" among the American people. *Roth v. United States,* 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957).

For the foregoing reasons, the Motion and Supporting Memorandum of Law of Defendant NYP Holdings, Inc. for Summary Judgment (DE 27) and Defendant, Jerry Colangelo's Motion for Summary Judgment and Supporting Memorandum of Law (DE 45) are GRANTED. Simultaneously herewith, the Court will enter a Judgment in favor of all Defendants.

New York Post, Sunday, November 30, 2003

**SLAP ON THE WRIST:** Suns forward Zarko Cabarkapa broke wrist after flagrant foul by Mavericks' Danny Fortson on Wednesday. Fortson got three-game suspension; Cabarkapa could be out up to eight weeks.

AP

# Stern warnings not enough

HOOP DU JOUR

PETER VECSEY

AS LONG as thugged out players are permitted to recklessly endanger the limbs and lives of helpless opponents without being suitably punished, David Stern's puffed-up campaign to eradicate violence from the NBA is a charade.

There's only one foolproof method to prevent vacant toes like Danny Fortson from randomly mugging defenseless rivals like Zarko Cabarkapa: Suspend his meaningless mass for as long as it takes the broken right wrist of the Suns rookie to heal completely.

Configure the consequence to fit the crime and, I assure the commissioner, the undesirables loitering in his league will get the message.

Instead, Stern renewed their license to strike again and again by meting out a measly three-game sentence. Why should other gangstas or wankstas be the least bit subdued about submarining a superstar if Fortson is eligible to maim and mangle for the Mavericks a week from now while his victim is shelved six-to-eight?

After 25 years of rule, can it be Stern (and obtuse advisers) still doesn't grasp the potential danger of maliciously destabilizing a player in mid-flight? Can it be the commissioner doesn't comprehend that Cabarkapa could've been injured far more seriously late in the fourth quarter of a 30-point Phoenix blowout when Fortson maliciously shoved him with two hands while he was airborne?

Does a deck have to be broken for Stern to realize the catastrophic ramifications of such an unseemly assault? Must someone wind up paralyzed before the commissioner cracks down hardcore?

What's he saying? Attempted murder is no problem; you have to murder somebody on one of my courts before I'll outlaw the brazen disregard for the safety of the susceptible.

Talk about shepherding justice down a sinkhole! Stern and Stu Jackson, the league's VP of Vainousness, must be taking their lead these days from TNT's Charles Barkley and Kenny Smith. In their inimitable opinion, the two inane analysts would proceed no further than admit Fortson's foul was flagrant and he deserved to be ejected.

After much badgering and challenging (but no sound reasoning) by Ernie Johnson, Smith — vacillating as usual between kiss-ing up to Barkley and forming his own view — conceded with his goaway breath, "It was terrible."

Does it get any more oblivious? Of course it does. Although, by now, you should be used to having your intelligence summarily insulted by Barkley, who's proud to be clueless and is glorified for it by the comatose members of the media.

For example, the other night he eagerly confessed to having no idea whether or not Scott Skiles (116-79 while in Phoenix) can coach. This from a guy who played four seasons for the Suns, still lives in Scottsdale, and has instant access to team owner Jerry Colangelo.

Considering TNT only pays Barkley $1 million or so, believe me, I certainly don't expect him to make a call to someone in the know regarding Skiles.

But I thought, perhaps, within the last five years, he might've lucked into some pertinent piece of info while cruising local strip clubs or strip malls.

As far as Barkley's stance on Fortson is concerned, even he couldn't be more full of it. I seem to recall, Bill Laimbeer pulling a similarly soiled stunt at Sir Charles's expense, and all hell breaking out, more than once.

Now Barkley acts as if a dirty hit on an utterly exposed high flyer is no big deal, simply part of being a professional athlete. Why? Because the player is a relatively unknown foreigner with an unpronounceable last name? Naturally, we don't need an imagination to know how ballistic Barkley would burst if the one writhing in pain had been Michael Jordan.

Jack Givens was caught way off base Friday evening when he repeatedly rebuked Tracy McGrady for giving the ball to Tyronn Lue for the game-winning miss in the 87-85 loss to the Raptors.

Did the Magic TV commentator somehow miss seeing the Bulls play during their six-year championship reign? Has the former Kentucky compulsive scorer ever heard of John Paxson, B.J. Armstrong, Steve Kerr, Trent Tucker and Bobby Hansen? Has Givens forgotten how many critical (playoff) games Chicago won because Jordan passed the ball when the defense descended upon him?

In other words, McGrady did exactly what he was supposed to do, what coaches and teammates appreciate and get rostered for it. Which is what happens, I suppose, when your team is 1-13 and one coach already has been convicted.

Immediately prior to McGrady's alleged mortal sin, he'd nailed a thirty-ahead permeate banker, only to be stuffed out by cousin Vince Carter's uncanny fall-away. On Orlando's final possession, McGrady drew three defenders — not one, not two, but three — to him, and instead of trying to win it by his lonesome, he responsibly handed off to a cutting Lue (the club's highest FG percentage shooter) for an uncontested 18-footer.

Unfortunately, instead of catching and shooting, Lue mistakenly caught, dribbled and shot, which gave the defender a chance to get a hand in his face and Givens the misguided opportunity to get on McGrady's case.

## Bulls deal Rose to Raptors

The maneuvering and manipulation is finally over, the much-negotiated Bulls-Raptors multi-player transaction, with a couple of new wrinkles, was consummated yesterday.

Jalen Rose was exiled to Toronto along with Donyell Marshall and Lonny Baxter. In return, Chicago gets Antonio Davis to calm its youngbloods, as well as Jerome Williams and Chris Jefferies.

— Peter Vecsey

## EXHIBIT A