[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 31, 2009
THOMAS K. KAHN
CLERK

_____

No. 07-12314

_____

D. C. Docket No. 00-02520-CV-TWT-1

DANNY M. BENNETT,
DANNY L. REID,

Plaintiffs-Appellants,

versus

DENNIS LEE HENDRIX, Individually and in his Official
Capacity as Sheriff of Forsyth County,
DAVID W. WATERS,
EARL A. SINGLETARY, Individually and in his Official
Capacity as Chief Deputy Sheriff of Forsyth County,

Defendants-Appellees.

_____

No. 07-14583

_____

D. C. Docket No. 00-02520-CV-TWT-1

DANNY M. BENNETT,
DANNY L. REID,

Plaintiffs-Appellants,

versus

DENNIS LEE HENDRIX, Individually and in his Official
Capacity as Sheriff of Forsyth County,

Defendant-Appellee.

_____

Appeals from the United States District Court
for the Northern District of Georgia
_____

(March 31, 2009)

Before EDMONDSON, Chief Judge, BLACK and PRYOR, Circuit Judges.

BLACK, Circuit Judge:

Danny M. Bennett and Danny L. Reid appeal from orders of the district court granting judgment as a matter of law to Dennis Lee Hendrix, David W. Waters, and Earl A. Singletary following jury verdicts in favor of Bennett on First Amendment retaliation claims under 42 U.S.C. § 1983 brought against Hendrix and Singletary and in favor of both Bennett and Reid on state law libel claims brought against Hendrix. On appeal, Bennett and Reid contend (1) the district court erred in granting qualified immunity to the defendants on Bennett and Reid's § 1983 First Amendment retaliation claims, (2) the district court erred in granting qualified immunity to the defendants on Bennett and Reid's § 1983 conspiracy

2

claims, and (3) the district court erred in concluding the alleged defamatory statements were protected under the First Amendment. Bennett and Reid also challenge a number of pretrial and evidentiary rulings. After review, we affirm in part and reverse and remand in part for the reasons that follow.

## I. BACKGROUND

This controversy stems from a 1998 referendum and a 2000 election for sheriff in Forsyth County, Georgia. In 1998, Forsyth County voters considered a referendum that would have established a countywide police force and diminished the power of the Forsyth County sheriff's department. Most of the department's power would have been transferred to the county police, which would have been under the supervision of county officials. Hendrix, the sheriff at the time, opposed the referendum. Bennett and Reid, however, supported the referendum, forming a committee in support of it.

The referendum was defeated at the polls, but Bennett and Reid allege Hendrix (along with Singletary and Waters, members of Hendrix's department at the time) engaged in a campaign of retaliation and intimidation against the plaintiffs because of their support of the referendum. This campaign intensified as the 2000 election for sheriff approached. Hendrix was challenged by Ted Paxton; Bennett and Reid both supported Paxton and made contributions to his campaign.

3

During the summer of 2000, Hendrix's campaign created three fliers to distribute to voters. On August 2–4, 2000, Hendrix mailed approximately 36,000 copies of the fliers to voters of Forsyth County. The fliers bore photographs of Bennett and Reid, among others, and announced "real criminals," "convicted criminals," and "criminal cash" were supporting Paxton. The fliers also stated Bennett and Reid had been arrested in Forsyth County and were funding Paxton's campaign. The fliers encouraged voters not to support a man whose campaign was backed by the "same type of criminals that terrorize Forsyth County."

On September 28, 2000, Bennett and Reid, along with Tammy Bennett (Bennett's wife), filed suit against Hendrix, Singletary, and Waters, as well as seven other named defendants and various John Does. The complaint included seventeen claims for relief and alleged violations of the First, Fourth, and Fourteenth Amendments, as well as a conspiracy to violate civil rights. It also presented a number of state law tort claims, including libel claims based upon the campaign fliers.

A. Preliminary Rulings by the District Court

In a June 21, 2001, order, the district court dismissed almost all of the federal law claims against the named defendants. It held, however, the plaintiffs' allegations were sufficient to withstand motions to dismiss and motions for

4

judgment on the pleadings as to the First Amendment retaliation claims, the § 1983 conspiracy claims, and the equal protection claims against Hendrix, Singletary, Waters, Deputy John Lockhart, and Forsyth County. The court also declined to rule on the defendants' qualified immunity defense based upon the pleadings. In the June order, the district court stated it would maintain jurisdiction over all the state law claims asserted in the case, but it later jettisoned the state law claims as to those defendants who had succeeded in having all the federal law claims against them dismissed. Following these rulings by the district court, Hendrix, Singletary, Waters, Lockhart, and Forsyth County were the sole remaining named defendants.

On February 1, 2002, the district court granted summary judgment to the defendants on Tammy Bennett's remaining federal law claims, effectively dismissing her as a plaintiff. It also granted summary judgment to Forsyth County and Lockhart on the federal law claims and declined to exercise supplemental jurisdiction over the state law claims against Lockhart, effectively dismissing those defendants from the suit. With respect to Hendrix, Singletary, and Waters, the district court dismissed all remaining federal law claims except for the § 1983

5

First Amendment retaliation claims and the § 1983 conspiracy claims.[1]  It did rule, however, Bennett and Reid's § 1983 retaliation claims premised on the campaign fliers failed as a matter of law and "the campaign fliers should be considered separately" from the other alleged acts of retaliation.  Finally, the court deferred a ruling on the defendants' qualified immunity defense until after presentation of evidence at trial.

Hendrix, Singletary, and Waters appealed the district court's denial of qualified immunity to this Court.

B.  *The Qualified Immunity Issue on Appeal*

In July 2003, we vacated that part of the district court's February 2002 order addressing qualified immunity.  In an unpublished opinion, we decided the facts in the record were sufficient to determine if the defendants had met their initial burden of proving they were acting within the scope of their discretionary authority; we then remanded for the district court to rule on qualified immunity. Upon remand, the district court issued an order on April 13, 2004, concluding Hendrix, Singletary, and Waters were not entitled to qualified immunity and

---

[1] Ultimately, among the state law claims, only the libel claims against Hendrix survived to trial.

denying their motions for summary judgment. The defendants appealed, and this litigation made its second journey to this Court.

In September 2005, this Court affirmed the district court's denial of qualified immunity to Hendrix, Singletary, and Waters. *Bennett v. Hendrix*, 423 F.3d 1247, 1256 (11th Cir. 2005). Addressing an issue of first impression, we adopted the "ordinary firmness" test in determining whether a defendant's retaliatory conduct adversely affected a plaintiff's protected speech. *Id.* at 1254. Applying the test to the evidence presented on summary judgment, this Court held Bennett and Reid had presented evidence of a First Amendment violation. *Id.* at 1255. Specifically, we concluded "the acts alleged here, if true, are sufficiently adverse that a jury could find they would chill a person of ordinary firmness from exercising his or her First Amendment rights." *Id.* Turning to the second prong of the qualified immunity inquiry, we held the law was clearly established so as to put the defendants on notice, stating "it is 'settled law' that the government may not retaliate against citizens for the exercise of First Amendment rights." *Id.* at 1256.

In concluding Bennett and Reid had demonstrated a constitutional violation, this Court explicitly noted a record "replete" with instances in which the defendants allegedly engaged the following retaliatory conduct: taking down

7

license tag numbers of cars at a forum in support of the referendum; setting up roadblocks near the plaintiffs' homes; stopping the plaintiffs' cars without reason and issuing false traffic citations; accessing government databases to obtain confidential information on the plaintiffs; attempting to obtain arrest warrants against the plaintiffs on trumped-up environmental charges; and mailing fliers to homes in Forsyth County depicting the plaintiffs as criminals terrorizing the county. *Id.* at 1249, 1254–55.

## C. *The Jury Trial*

Following this Court's decision affirming the district court's denial of qualified immunity, the case proceeded to a jury trial on April 17, 2007. By that time, only the following claims remained: (1) the § 1983 First Amendment retaliation claims against Hendrix, Singletary, and Waters; (2) the § 1983 conspiracy claims against Hendrix, Singletary, and Waters; and (3) the state law libel claims against Hendrix.

### 1. *Evidence relating to the § 1983 claims against Hendrix, Singletary, and Waters*

At trial, Bennett and Reid attempted to establish Hendrix had formed a "strike force" to harass and intimidate his political opponents, including Bennett and Reid, following the 1998 referendum. They offered the testimony of former

8

members of the Forsyth County sheriff's department to support their allegations of a retaliatory "strike force." For instance, William Miller, a lieutenant in the criminal investigation division, testified Singletary informed him during a February 1999 command staff meeting he was being transferred to internal affairs to investigate 50 to 75 of Hendrix's political opponents. Several other sheriff's deputies testified they were asked to conduct surveillance on county commissioners, certain supporters of the 1998 referendum, and a publisher of a local newspaper. None of the deputies, however, testified Hendrix, Singletary, or Waters asked them to perform surveillance on Bennett or Reid.

As evidence of the alleged retaliatory acts taken against them, Bennett and Reid presented evidence of a 2000 investigation by Deputy Lockhart, a former defendant in the suit. Lockhart, who was the environmental code enforcement officer in Hendrix's department, investigated one of Bennett and Reid's work sites for violations of a solid waste ordinance. Lockhart informed the county attorney he planned to arrest Bennett and Reid during the summer of 2000, but he never arrested either man. He did, however, advise a general contractor not to hire Reid. He also filed a complaint with the Georgia Environmental Protection Division, which ultimately issued a notice of violation for debris located on the property.

9

Bennett also testified he was stopped by unnamed sheriff's deputies at a roadblock near his home in April 2000. Although other cars were also stopped at the roadblock, Bennett contended the roadblock was intended to harass him. He testified he was the only driver to have to exit his vehicle and his car was the only one examined by drug-sniffing dogs. Bennett and Reid both testified sheriff's deputies were patrolling their neighborhoods and work sites during this time period. Bennett stated he saw two to three deputy cars come by his house within an hour, a marked increase. Reid also testified he saw a patrol car sitting in his subdivision and across from his job.

Finally, Bennett presented evidence regarding the alleged harassment and intimidation of his wife, Tammy Bennett, by sheriff's deputies. Tammy Bennett received a citation for speeding from Deputy Sheriff B.A. Finley on July 28, 2000, and a citation for running a stop sign from Deputy Sheriff David Witkowski on July 29, 2000. These citations were issued 14 hours apart at the same spot, less than a quarter of a mile from her home. Bennett also testified a deputy tailgated Tammy Bennett for eight or nine miles to her home and flashed his blue lights as she pulled into the driveway.

## 2. *Evidence relating to the libel claims against Hendrix*

### a. *Plaintiffs' Exhibits 1, 2, and 3*

Bennett and Reid introduced the three alleged defamatory campaign fliers as Plaintiffs' Exhibits 1, 2, and 3 at trial. Plaintiffs' Exhibit 1 features a front page with text stating, "You know your Sheriff is doing a good job when . . ." The top of the second page completes the sentence with ". . . criminals are supporting his opponents [sic] campaign." Underneath this text is a box with photographs of six men, including Bennett and Reid, and a caption to the left that reads, "The Ted Paxton Chain Gang." The text under Bennett's photograph reads, "Arrested and housed in the Forsyth Jail, Bennett gave Paxton hundreds for his smear campaign on two occasions." Under Reid's photograph, the flier states, "Developer was arrested for refusing to obey order to stop construction. He is now giving substantial amounts of cash to Paxton." The other men featured in the box are Paxton; a former county commissioner who, according to the flier, received money from a man arrested for bribery; a man who was allegedly arrested for assault and making "terroristic threats"; and another former county commissioner who, according to the flier, pled guilty to kidnapping. Text in paragraph form appears below the box stating, among other things, "You know our Sheriff is doing a good job when real criminals and their associates are supporting his opponents [sic]

11

campaign," and "Ted Paxton has been running a malicious smear campaign against Sheriff Denny Hendrix with support he's received from criminals." It concludes, "On August 8th, let's vote to keep Forsyth safe from criminals and convicted felons."

The front of Plaintiffs' Exhibit 2 contains a mug shot of Bennett taken after his 1995 arrest accompanied by text stating, "Should a Candidate for Sheriff finance his campaign using cash from convicted criminals?" Bennett's photograph is the only one appearing on the flier's front page. Under his mug shot, the text states, "This man, arrested and housed in the Forsyth County Jail, gave hundreds in cash to Paxton's campaign on two different occasions."[2] The second page of the flier answers the question from the front of the flier with text stating, "Ted Paxton thinks so." The left side of the page features a box with photographs of the same men from the first flier, minus Reid. The text accompanying Bennett's photograph states, "Arrested and housed in the Forsyth Jail, this man gave hundreds to Paxton's smear campaign on two different occasions." The right side of the page contains text in paragraph form. A portion of the text reads, "It's a scary thought isn't it? A candidate for Sheriff taking

_____

[2] A footnote call of "1" appears after this text. The flier, however, contains no corresponding reference to this footnote call.

12

money from convicted criminals and their associates.  The same type of criminals who terrorize Forsyth County."  Like the first flier, it concludes, "On August 8th, let's vote to keep Forsyth safe from criminals and convicted felons."

The last flier, introduced as Plaintiffs' Exhibit 3, consists of three pages. The front page contains a photograph of a local newspaper publisher with text stating, "What do you think?"  The next page features a box at the top of the page. The question "Should this Gang run your Sheriff's Office?" appears at the top of the box.  To the left, the text reads, "The Ted Paxton Chain Gang."  The box contains photographs of the same six men featured on the first flier.  The text accompanying Bennett's photograph reads, "Arrested and housed in the Forsyth Jail, Bennett gave Paxton hundreds to help finance Paxton's smear campaign." Under Reid's photograph, the text states, "Developer was arrested for refusing to obey order to stop construction.  He is now giving substantial amounts of cash to Paxton."  Additional text in paragraph form appears under the box on the left side of the page.  This text makes two references to "criminal cash."  The right side of the page features another box with numerous slogans.  Here too the flier references "cash from criminals" and "criminal cash."  The last page of the flier contains endorsements from various individuals.

### b. Testimony regarding the fliers

At trial, evidence regarding the production of the campaign fliers consisted mostly of testimony from Gerard Petrotto, Hendrix's public information officer, and Jason Williams, Hendrix's campaign consultant, as well as Hendrix himself. The process of creating the fliers began at a meeting attended by Hendrix, Hendrix's wife, Singletary, Petrotto, and Williams in July 2000. At that meeting, Hendrix produced 60 to 70 manila files containing arrest information and mug shots of certain individuals. One of the mug shots was of Bennett, whom Hendrix called "wild-haired boy."

Hendrix obtained this arrest information from sheriff's department records. He testified he had heard some of Paxton's financial contributors had "some skirmishes with the law." Acting upon this information, Hendrix asked the voter registrar for a list of Paxton's contributors. He took the names to Waters and told Waters to have someone run the names through the sheriff's department computer system to see if any of Paxton's contributors had records. Per Hendrix's orders, two individuals in the sheriff's department, Marilyn Dressler Smith and Jamie Brumbelow, searched the department's records for information on Bennett and Reid. The searches on Bennett and Reid turned up records of arrests for both men

14

in 1995 for refusing to obey a stop work order and for obstruction; those charges were ultimately dismissed as to both men.

Sometime after the July meeting, Williams suggested using the mug shots in campaign fliers. Hendrix, Petrotto, and Williams all testified Williams chose the wording and generated ideas for the fliers. According to Hendrix, "[E]verything on the fliers [Williams] developed and placed on there. It was his idea, his creation." At the same time, however, Hendrix played an "active part" in creating the fliers and came up with his own ideas.

Petrotto testified Williams would create drafts of the fliers, email them to Petrotto, and Petrotto would print them for Hendrix's review. Hendrix approved all the fliers through Petrotto. Hendrix testified he saw the final proofs of the fliers before they were mailed and made the decisions whether to change them and whether to mail them. Ultimately, Hendrix claimed full responsibility for his campaign and the fliers.

On the stand, Hendrix also testified he did not believe Bennett and Reid were convicted criminals:

> Q: You knew by your definition, the way you defined criminal, as of August of 2000, you never thought that Mr. Reid or Mr. Bennett were criminals?
> A: I believe that to be correct.

15

He stated he knew the fliers would likely hurt their reputations. Hendrix added he believed it was "very possible" someone could look at the front of Plaintiffs' Exhibit 2, which features a mug shot of Bennett and the text of "Should a Candidate for Sheriff finance his campaign using cash from convicted criminals?" and think Bennett was a convicted criminal. He admitted he thought the fliers were harsh and he might get sued.

Other members of Hendrix's campaign staff had concerns regarding the fliers. Petrotto testified he was particularly troubled by the front of Plaintiffs' Exhibit 2. Petrotto sent Williams an email on July 24, 2000, suggesting a change in the text to "Should a candidate for Sheriff finance his campaign from convicted criminals or those arrested for violating Georgia Criminal Code?" According to Petrotto, Hendrix wanted to make the change, but, for some reason, it was not made. Williams, however, testified he had a conversation with Hendrix's campaign about omitting the extra language, and the campaign agreed to leave it out. Williams did not remember whether Hendrix personally agreed or not.

Petrotto thought the fliers might result in a lawsuit and suggested Hendrix have an attorney review the fliers. Similarly, Williams told Petrotto that Hendrix would be sued over the fliers. Mark Hoffman, who was a major in the sheriff's

16

department under Hendrix, testified there was concern at sheriff's department command staff meetings the fliers might result in lawsuits.

The fliers were mailed on August 2, 3, and 4, 2000. Afterward, Bennett and Reid testified they became the subject of a number of jokes. A shareholder of a bank on whose board Bennett and Reid served also notified the Georgia Department of Banking and Finance regarding the allegations in the fliers. In response to the shareholder's letter, the Georgia Department of Banking and Finance contacted the president and CEO of the bank, requesting the bank provide the department with information regarding the validity of the allegations. The bank informed the department the charges against Bennett and Reid to which the fliers referred were dismissed and maintained Bennett and Reid "were victims of malicious political mailings." Its response was apparently the end of the matter, and both men continued to serve as directors of the bank.

3. *The jury verdict*

After nine days of testimony, the district court finally gave the case to the jury on April 27, 2007. In its charge, the court articulated the elements needed to prove a First Amendment retaliation claim and also instructed the jury regarding conspiracy liability under § 1983. With respect to the state law libel claims against Hendrix, the district court informed the jury the plaintiffs were private

17

figures and thus an ordinary standard of care applied in determining liability. Consistent with its February 2002 order, the court further instructed the jury that "publication of the campaign fliers was not action under color of state law and may not be considered by you as acts of retaliation for the Plaintiffs' First Amendment retaliation claims." The district court judge gave the jury a general verdict form, which listed the § 1983 First Amendment retaliation claims against Hendrix, Singletary, and Waters, and the state law libel claims against Hendrix.

On May 4, 2007, the jury returned its verdicts. With respect to Bennett's § 1983 First Amendment retaliation claims, the jury found Hendrix liable for $930,000 in compensatory damages and $1,030,000 in punitive damages. Singletary was found liable for $400,000 in compensatory damages and $455,000 in punitive damages. The jury found in favor of Waters on Bennett's § 1983 First Amendment retaliation claim. Meanwhile, the jury was hung as to Reid's § 1983 First Amendment retaliation claims against all three defendants. Regarding the state law libel claims, the jury returned a verdict in favor of both Bennett and Reid against Hendrix, awarding Bennett $3,600,000 in damages and Reid $3,100,000 in damages.

4. *The district court's judgment as a matter of law in favor of the defendants*

At the conclusion of the plaintiffs' case, the defendants moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a). The district court deemed the motion timely but recommended postponing argument. The defendants agreed and made their arguments for judgment as a matter of law at the close of evidence, at which time the district court denied the motion as to the state law libel claims against Hendrix and took under advisement the motion as to the § 1983 First Amendment retaliation claims, allowing the case to proceed to the jury.

After the jury verdict, however, the district court granted Hendrix, Singletary, and Waters judgment as a matter of law on the § 1983 First Amendment retaliation claims, basing its decision on qualified immunity. Ruling from the bench, the court went through each of the alleged acts of retaliation this Court considered in its 2005 decision and noted "a complete failure to produce evidence" of participation by Hendrix, Singletary, or Waters in the acts:

> There was a lot of evidence, of hearsay, of gossip, of rumor, of innuendo, of reckless talk. But in terms of actual proof of something being done to these Plaintiffs by these Defendants, there was nothing. And for those reasons, I don't believe that the Plaintiffs have shown a violation of their constitutional rights; and I think the Defendants are entitled to qualified immunity.

19

On May 17, 2007, Hendrix renewed his motion for judgment as a matter of law under Rule 50(b) to challenge the judgment against him on the libel claims. On November 9, 2007, the district court granted Hendrix's motion, finding the campaign fliers were "loaded with innuendo, half truths, and rhetorical hyperbole" and protected by the First Amendment. After reciting numerous examples of inflammatory campaign speech from our nation's history, the court concluded the fliers "were political speech of the highest order and deserving of the highest protection."

Bennett and Reid appealed to this Court.

## II. STANDARD OF REVIEW

We review *de novo* a district court's grant of a Rule 50 motion for judgment as a matter of law, applying the same standards as the district court. *Campbell v. Rainbow City*, 434 F.3d 1306, 1312 (11th Cir. 2006). In doing so, we examine the evidence in the light most favorable to the nonmoving party. *Thosteson v. United States*, 331 F.3d 1294, 1298 (11th Cir. 2003). The nonmovant, however, "must put forth more than a mere scintilla of evidence suggesting that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions." *Id.* (internal quotation marks omitted). "If the nonmoving party failed to make a showing on an essential element of his case with respect to which

20

he had the burden of proof, then the entry of judgment as a matter of law is appropriate." *Johnson Enters. of Jacksonville, Inc. v. FPL Group, Inc.*, 162 F.3d 1290, 1308 (11th Cir. 1998) (internal quotation marks omitted).

## III. DISCUSSION

On this appeal, Bennett and Reid contend the district court erred in granting the defendants judgment as a matter of law on the § 1983 First Amendment retaliation claims, the § 1983 conspiracy claims, and the state law libel claims. For the reasons stated below, we conclude Bennett and Reid failed to show a constitutional violation by Hendrix, Singletary, and Waters, and thus the district court correctly entered judgment as a matter of law in favor of the defendants on the § 1983 claims. We hold, however, the front of one of the campaign fliers displayed a statement that was not protected by the First Amendment and thus reverse the district court's grant of judgment as matter of law in favor of Hendrix on Bennett's libel claim.[3]

*A. The § 1983 First Amendment Retaliation Claims*

At the close of evidence, Hendrix, Singletary, and Waters moved for judgment as a matter of law on Bennett and Reid's § 1983 claims, asserting the

---

[3] Bennett and Reid also challenge a number of the district court's other rulings. With respect to these issues, we conclude their arguments are without merit.

21

defense of qualified immunity. The district court took the motion under advisement and allowed the case to proceed to the jury. After the jury returned verdicts in favor of Bennett against Hendrix and Singletary on the § 1983 claims, the district court granted the defendants' motion for judgment as a matter of law, concluding there was "a complete failure" to produce evidence of a constitutional violation and Hendrix, Singletary, and Waters were thus entitled to qualified immunity. Bennett and Reid argue the district court erred in granting judgment as a matter of law in favor of the defendants because its decision conflicts with this Court's 2005 opinion affirming the district court's denial of the defense of qualified immunity on summary judgment, which, according to Bennett and Reid, established the law of the case with respect to the qualified immunity issue. Bennett and Reid also contend they presented ample evidence of a constitutional violation and the district court improperly substituted its view of the evidence for the jury's determinations by concluding Bennett and Reid had failed to establish a constitutional violation.

*1. The law of the case*

When a district court denies a qualified immunity defense on summary judgment, a defendant may raise the defense again in a Rule 50 motion. *Cottrell v. Caldwell*, 85 F.3d 1480, 1488 (11th Cir. 1996). "That type of motion will

22

sometimes be denied because the same evidence that led to the denial of the summary judgment motion usually will be included in the evidence presented during the plaintiff's case . . . ." *Johnson v. Breeden*, 280 F.3d 1308, 1317–18 (11th Cir. 2002). When the evidence produced at trial mirrors the evidence presented on summary judgment, "the same evidentiary dispute that got the plaintiff past a summary judgment motion asserting the qualified immunity defense will usually get that plaintiff past a Rule 50(a) motion asserting the defense, although the district court is free to change its mind." *Id.* at 1318.

A district court may not change its mind, however, if a prior opinion of this Court has established the law of the case. "Under the law of the case doctrine, both the district court and the appellate court are generally bound by a prior appellate decision of the same case." *Oladeinde v. City of Birmingham*, 230 F.3d 1275, 1288 (11th Cir. 2000). The law of the case doctrine pertains to "those legal issues that were actually, or by necessary implication, decided in the former proceeding." *Wallis v. Justice Oaks II, Ltd. (In re Justice Oaks II, Ltd.)*, 898 F.2d 1544, 1549 n.3 (11th Cir. 1990). "Exceptions to this doctrine apply when substantially different evidence is produced, when there has been a change in controlling authority, or when the prior decision was clearly erroneous and would

23

result in manifest injustice." *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1283 (11th Cir. 2005).

Bennett and Reid contend this Court's 2005 opinion in *Bennett v. Hendrix*, 423 F.3d 1247 (11th Cir. 2005), decided the qualified immunity issue and the evidence presented at trial was not different than the evidence presented at the summary judgment stage. We disagree. Although the 2005 appeal involved the same issue as this appeal—the qualified immunity defense—this Court's opinion relied on a number of alleged facts that Bennett and Reid failed to demonstrate at trial or that the district court ruled could not be considered for purposes of the § 1983 First Amendment retaliation claim. *See id.* at 1249, 1254–55. Because "substantially different" evidence was produced at trial, our 2005 opinion does not constitute the law of the case. *See Jackson*, 405 F.3d at 1283. Accordingly, the district court was "free to change its mind" with respect to the defense of qualified immunity. *See Johnson*, 280 F.3d at 1318.

### 2. *The finding of no constitutional violation*

To prevail on a First Amendment retaliation claim and prove a constitutional violation, a plaintiff must establish (1) his or her speech was protected by the First Amendment, (2) the defendant's retaliatory acts would likely deter a person of ordinary firmness from exercising his or her First Amendment

24

rights, and (3) a causal connection exists between the retaliatory actions and the adverse effect on the protected speech. *Bennett*, 423 F.3d at 1250, 1254. If a plaintiff fails to make a showing on any of the three elements, judgment as a matter of law under Rule 50 is appropriate. *See Johnson Enters. of Jacksonville*, 162 F.3d at 1308.

The district court concluded Bennett and Reid failed to produce evidence of any participation by Hendrix, Singletary, or Waters in retaliatory acts against Bennet and Reid, and, consequently, Bennett and Reid had not demonstrated a constitutional violation. After a thorough review of the record, we likewise found no evidence of any participation by the defendants in retaliatory acts against Bennett and Reid. Because Bennett and Reid were unable to satisfy the second element of the First Amendment retaliation analysis, judgment as a matter of law was appropriate in this case. *See Johnson Enters. of Jacksonville*, 162 F.3d at 1308.

B. *The § 1983 Conspiracy Claims*

Bennett and Reid also argue the district court erred in granting judgment as a matter of law on the § 1983 conspiracy claims, raising the same arguments they presented in connection with the individual First Amendment retaliation claims. Specifically, they contend the district court's ruling conflicts with our 2005

25

opinion affirming the district court's denial of the defense of qualified immunity on summary judgment and the district court improperly substituted its view of the evidence for the jury's determinations.

"[T]o sustain a conspiracy action under § 1983, as distinguished from § 1985, a plaintiff must show an underlying actual denial of its constitutional rights." *GJR Invs., Inc. v. County of Escambia*, 132 F.3d 1359, 1370 (11th Cir. 1998). In other words, "[t]he conspiratorial acts must impinge upon the federal right; the plaintiff must prove an actionable wrong to support the conspiracy." *Bendiburg v. Dempsey*, 909 F.2d 463, 468 (11th Cir. 1990). A conspiracy claim is simply "the legal mechanism through which to impose liability on each and all of the Defendants without regard to the person doing the particular act." *Nesmith v. Alford*, 318 F.2d 110, 126 (5th Cir. 1963).[4]

Bennett and Reid failed to show an underlying denial of their constitutional rights, as we discussed in Part III.A. Therefore, Bennett and Reid cannot sustain a conspiracy action under § 1983. *See GJR Invs., Inc.*, 132 F.3d at 1370. The

---

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

26

district court thus did not err in granting judgment as a matter of law in favor of

Hendrix, Singletary, and Waters on the conspiracy claims.[5]

## C. The State Law Libel Claims

The district court denied Hendrix's motion for judgment as a matter of law

on Bennett and Reid's libel claims following the presentation of evidence at trial.

Hendrix, however, filed a renewed motion for judgment as a matter of law on

May 17, 2007, which the district court granted on November 9, 2007.

Analogizing to some examples of offensive political speech from our nation's

history, the district court found the fliers were "loaded with innuendo, half truths,

and rhetorical hyperbole" and concluded "[t]he campaign fliers—however

offensive—were political speech of the highest order and deserving of the highest

protection." Accordingly, the court held "the First Amendment trumps the

Plaintiffs' right to recover damages for defamation." Bennett and Reid contend

the district court erred in granting judgment as a matter of law in favor of Hendrix

on the libel claims because the statements on the fliers do not constitute rhetorical

hyperbole or nonliteral assertions of fact. Specifically, they argue the fliers

---

[5] For these same reasons, we reject Bennett and Reid's argument that the district court erred in failing to separately list the conspiracy claims on the jury verdict form.

contain "straightforward factual assertions" identifying Bennett and Reid as "convicted criminals" and thus are not protected by the First Amendment.

Under Georgia law, "libel is a false and malicious defamation of another . . . tending to injure the reputation of the person and exposing him to public hatred, contempt, or ridicule." O.C.G.A. § 51-5-1. To maintain an action for libel, the communication must be both false and malicious. *Speedway Grading Corp. v. Gardner*, 425 S.E.2d 676, 678 (Ga. Ct. App. 1992). "In determining whether a statement is false, '[d]efamation law overlooks minor inaccuracies and concentrates upon substantial truth. . . . [A] statement is not considered false unless it would have a different effect on the mind of the viewer from that which the pleaded truth would have produced.'" *Jaillett v. Ga. Television Co.*, 520 S.E.2d 721, 724 (Ga. Ct. App. 1999) (quoting *Brewer v. Rogers*, 439 S.E.2d 77, 81 (Ga. Ct. App. 1993)).

The First Amendment, however, places constitutional limits on the application of the state law of defamation, including the type of speech that may be the subject of state defamation actions. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 16, 110 S. Ct. 2695, 2704 (1990). "[B]oth the Supreme Court and this Court of Appeals have long recognized that a defamation claim may not be actionable when the alleged defamatory statement is based on non-literal

28

assertions of 'fact.'" *Horsley v. Rivera*, 292 F.3d 695, 701 (11th Cir. 2002). "This provides assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation." *Milkovich*, 497 U.S. at 20, 110 S. Ct. at 2706.

Consistent with this principle, the Supreme Court has held use of the word "blackmail" to describe a real estate developer's negotiating position was not slander when spoken at public meetings or libel when reported in a local newspaper because, within that specific context, "even the most careless reader must have perceived that the word was no more than rhetorical hyperbole," and "[n]o reader could have thought that either the speakers at the meetings or the newspaper articles reporting their words were charging [the developer] with the commission of a criminal offense." *Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 13–14, 90 S. Ct. 1537, 1541–42 (1970). Likewise, we have found a television commentator's statements that a guest on his show, an anti-abortion activist, was an accomplice to a doctor's murder were protected under the First Amendment as rhetorical hyperbole when "no reasonable viewer would have concluded that [the commentator] was literally concluding that [the show's guest] could be charged with a felony in connection with [the doctor's] murder." *Horsley*, 292 F.3d at 702.

The dispositive question is thus whether a reasonable factfinder could conclude the challenged statements imply an assertion that "is sufficiently factual to be susceptible of being proved true or false." *Milkovich*, 497 U.S. at 21, 110 S. Ct. at 2707; *see also Edison v. Berry*, 415 S.E.2d 16, 17 (Ga. Ct. App. 1992) ("The pivotal questions are whether [the challenged] statements can reasonably be interpreted as stating or implying defamatory facts about plaintiff and, if so, whether the defamatory assertions are capable of being proved false."). In undertaking this inquiry, we must consider the circumstances in which the statements were expressed. *Horsley*, 292 F.3d at 702. If we conclude the statements consist of "the sort of loose, figurative language that no reasonable person would believe presented facts," the First Amendment provides protection, and a plaintiff may not recover damages for libel. *Id*; *see also Milkovich*, 497 U.S. at 21, 110 S. Ct. at 2707 (finding a newspaper column was not protected by the First Amendment because the challenged statements were not "the sort of loose, figurative, or hyperbolic language which would negate the impression that the writer was seriously maintaining that petitioner committed the crime of perjury").

Turning to the facts of this case, we conclude two of the fliers, Plaintiffs' Exhibits 1 and 3, cannot sustain a damages award for libel under Georgia law because they do not contain false statements. The second page of both these fliers

30

features a photograph of a man who, according to the fliers, pled guilty to kidnapping. Text on these pages insinuates "convicted criminals," "real criminals," and "criminal cash" support Paxton's campaign. A person who pleads guilty to kidnapping is a convicted criminal. *See Black's Law Dictionary* 358, 402 (8th ed. 2004) (defining "convict" as "[t]o find (a person) guilty of a criminal offense upon a criminal trial, a plea of guilty, or a plea of nolo contendere (no contest)" and "criminal" as "[o]ne who has committed a criminal offense" and "[o]ne who has been convicted of a crime"). Because the man who pled guilty to kidnapping is a "convicted criminal," the statements on Plaintiffs' Exhibits 1 and 3 asserting "criminals," "real criminals," "convicted felons," and "criminal cash" support Paxton's campaign are not false.[6]

Furthermore, the text specifically referring to Bennett and Reid on Plaintiffs' Exhibits 1 and 3 does not contain false statements. On Plaintiffs' Exhibit 1, Bennett's mug shot appears with the text, "Arrested and housed in the Forsyth County Jail, Bennett gave Paxton hundreds for his smear campaign on two occasions." On Plaintiffs' Exhibit 3, the text accompanying Bennett's photograph reads, "Arrested and housed in the Forsyth County Jail, Bennett gave Paxton

---

[6] Additionally, Reid testified at trial that he pled guilty to driving under the influence in the early 1980s.

31

hundreds to help finance Paxton's smear campaign." Both these statements are true. On both Plaintiffs' Exhibits 1 and 3, Reid's mug shot appears with the text, "Developer was arrested for refusing to obey order to stop construction. He is now giving substantial amounts of cash to Paxton." Like the statements accompanying Bennett's photograph on the fliers, the statements referring to Reid are true.

Accordingly, because both the statements asserting "criminals" support Paxton's campaign and the text accompanying Bennett and Reid's photographs are true, Plaintiffs' Exhibits 1 and 3 are not defamatory and cannot form the basis for a libel claim under Georgia law. *See* O.C.G.A. § 51-5-1; *see also* O.C.G.A. § 51-5-6. (stating truth may be proved as a justification for an alleged libel). The same reasoning applies to the statements on the second page of Plaintiffs' Exhibit 2, which also contains a photograph of the man who pled guilty to kidnapping and similar language accompanying Bennett's mug shot as appears on Plaintiffs' Exhibits 1 and 3. We conclude Bennett and Reid cannot recover on their libel claims with respect to these particular statements.

The front page of Plaintiffs' Exhibit 2, however, is a different matter. The front of this flier contains a mug shot of Bennett accompanied with the text, "Should a Candidate for Sheriff finance his campaign using cash from convicted

criminals?" Bennett is the only person featured on the front of this flier. Although he has a record of an arrest from 1995, Bennett is not a "convicted criminal" under any definition. Indeed, Hendrix, as a law enforcement officer, understood the definition of "convicted criminals," and he testified at trial he knew Bennett was not one when the fliers were published in August 2000. The implication of a mug shot and the sentence, "Should a Candidate for Sheriff finance his campaign using cash from convicted criminals?", is that the photo is of a convicted felon, and it is defamatory of Bennett, satisfying the definition of libel under Georgia law. *See* O.C.G.A. § 51-5-1.

The question remains, though, whether the challenged language on the front on Plaintiffs' Exhibit 2 is protected by the First Amendment. Finding it constituted "rhetorical hyperbole," the district court held the speech was "deserving of the highest protection" and could not be the subject of a defamation action. We disagree. The language on the front of the flier is not "the sort of loose, figurative language that no reasonable person would believe present[s] facts." *See Horsley*, 292 F.3d at 702. A reasonable factfinder could conclude that, with the photo, the sentence, "Should a Candidate for Sheriff finance his campaign using cash from convicted criminals?", is an assertion regarding Bennett—the only person featured on the page—that "is sufficiently factual to be

33

susceptible of being proved true or false." *See Milkovich*, 497 U.S. at 21, 110 S. Ct. at 2707. Specifically, the challenged language asserts Bennett is a convicted criminal. Whether that assertion is false is verifiable from Bennett's criminal records. Accordingly, the front page of Plaintiffs' Exhibit 2 is not protected by the First Amendment.[7]

The context in which the language on the front of the flier was expressed supports our conclusion that the First Amendment does not provide protection. The flier was published by the chief law enforcement officer of Forsyth County. The only person who appears on its front page is Bennett. The photograph of Bennett is a mug shot taken shortly after his 1995 arrest. In the photograph, Bennett has a disheveled appearance, and his hair is not groomed. The intended message is clear—Bennett is a convicted criminal—and a reasonable reader could conclude Hendrix, the sheriff of Forsyth County, was stating Bennett had been convicted of a criminal offense. Indeed, Hendrix acknowledged during his trial

---

[7] In reaching this conclusion, we need not decide whether the challenged language involved a public figure or a private figure on a matter of public concern because the district court concluded the speech was protected under the First Amendment as rhetorical hyperbole. The First Amendment can provide protection against state law defamation claims on two bases: (1) the *type* of speech involved and (2) the *person* whom the speech concerns and the *culpability* of the speaker. *See Milkovich*, 497 U.S. at 20, 110 S. Ct. at 2706–07. The inquiry associated with each has developed under two separate lines of Supreme Court cases. *See id.* We analyze only the *type* of speech involved here, as the district court's decision did not rest on the *person* whom the speech concerned.

testimony it was "very possible" a recipient of the flier could read the flier and think Bennett was a convicted criminal. In this context, "convicted criminals" is "not the sort of loose, figurative, or hyperbolic language which would negate the impression that [Hendrix] was serious maintaining" Bennett was a convicted criminal. *See Milkovich*, 497 U.S. at 21, 110 S. Ct. at 2707.

We recognize "debate on public issues should be uninhibited, robust, and wide-open," *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S. Ct. 710, 721 (1964), and "language of the political arena . . . is often vituperative, abusive, and inexact," *Watts v. United States*, 394 U.S. 705, 708, 89 S. Ct. 1399, 1401–02 (1969). As one of our sister circuit courts has noted, "[P]olitical statements are inherently prone to exaggeration and hyperbole. If political discourse is to rally public opinion and challenge conventional thinking, it cannot be subdued. Nor may we saddle political speakers with implications their words do not literally convey . . . ." *Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 244 F.3d 1007, 1019 (9th Cir. 2001) (internal citation omitted). We are sensitive to the fact this flier was published during a heated political campaign, but this fact does not alter our analysis. The language on the front page of Plaintiffs' Exhibit 2 is exact, and the words literally convey the assertion that Bennett is a convicted criminal. False factual assertions are not protected under

35

the First Amendment, even if expressed within the context of political debate. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340, 94 S. Ct. 2997, 3007 (1974) ("[T]here is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues." (quoting *New York Times Co.*, 376 U.S. at 270, 84 S. Ct. at 721)).

We also recognize the tone of the speech and its medium of expression can often signal opinion or nonliteral assertions of fact, especially within the political arena. *See Milkovich*, 497 U.S. at 6, 110 S. Ct. at 2707 (noting "the general tenor of an article" may negate a literal assertion); *see also Secrist v. Harkin*, 874 F.2d 1244, 1249 (8th Cir. 1989) (noting a campaign press release "is at least as likely to signal political opinion as a newspaper editorial or political cartoon"). That said, the front page of Plaintiffs' Exhibit 2 is not styled as a cartoon, parody, or editorial, and its tone is not satirical or exaggerated. Rather, it involves an assertion by an law enforcement officer regarding the criminal history of one of his opponent's supporters, accompanied by a mug shot of that supporter. The tone of the flier supports our conclusion that it is not protected by the First Amendment.

36

The type of speech protected by the First Amendment is a context-driven inquiry, and we thus emphasize the unique circumstances of this case. If the challenged language on the front page of Plaintiffs' Exhibit 2 had been "criminals" instead of the more exact and literal phrase "convicted criminals," this might be a different case. If a photograph of a convicted criminal had appeared alongside Bennett's mug shot on the front page of the flier, this might be a different case. If Bennett's mug shot had been omitted from the page, this might be a different case. Here, however, the use of only Bennett's mug shot and the precise language of "convicted criminals" leads to one conclusion—the speech constitutes a false factual assertion and is not protected by the First Amendment.[8]

---

[8] For these same reasons, we reject Hendrix's argument that the speech is pure opinion protected under the First Amendment. Because the factual premises of the challenged language are revealed in the fliers, Hendrix argues the speech, in addition to constituting rhetorical hyperbole, amounts to pure opinion and is not actionable.

The state of Georgia has immunized "not only statements of rhetorical hyperbole . . . but also statements clearly recognizable as pure opinion because their factual premises are revealed." *Jaillett*, 520 S.E.2d at 726. "If an opinion is based upon facts already disclosed in the communication, the expression of the opinion implies nothing other than the speaker's subjective interpretation of the facts." *Id*.

Although the front page of Plaintiffs' Exhibit 2 does state Bennett was "arrested and housed in the Forsyth County Jail," the question "Should a Candidate for Sheriff finance his campaign using cash from convicted criminals?" is not Hendrix's subjective interpretation of these facts. Hendrix's own testimony undermines his argument, as he admitted at trial that being arrested did not make an individual a "convicted criminal." The challenged language is not protected under the First Amendment as pure opinion.

Finally, in reaching our conclusion, we note, within the context of campaigns for law enforcement offices, the particular relevance of information regarding criminal and arrest records of candidates and their supporters. This information is crucial for the public to determine which individuals to entrust the responsibility of maintaining and executing the laws of this land. Such information, however, must be truthful. Candidates for law enforcement offices cannot misrepresent the criminal histories of their opponents and their opponents' supporters with false factual assertions.[9] In this case, the challenged language on the front of Plaintiffs' Exhibit 2 misrepresents Bennett's criminal history with false factual assertions and crosses the line from healthy political debate and pertinent public information to defamation. Accordingly, we reverse the district court's judgment as a matter of law in favor of Hendrix on Bennett's state law libel claim.[10]

---

[9] The First Amendment, however, may still provide protection to false factual assertions depending on the *person* whom the speech concerns and the *culpability* of the speaker. *See Milkovich*, 497 U.S. at 20, 110 S. Ct. at 2706–07. Again, in this case, we only determine the *type* of speech involved and whether the First Amendment provides protection for it.

[10] Hendrix has raised a number of alternative arguments on appeal. Specifically, he contends (1) he is entitled to judgment as a matter of law because the fliers did not constitute libel per se and Bennett and Reid offered no proof of special damages; (2) he is entitled to judgment as a matter of law because Bennett and Reid failed to prove actual injury; and (3) he is entitled to a new trial or remittitur because the verdict was excessive, the district court erred in refusing to allow evidence of a clarification and in refusing to charge presumed damages are a rebuttal presumption, and there was confusion of issues for the jury. We need not address these issues because the district court did not consider them in granting Hendrix judgment as a matter

## IV. CONCLUSION

For the foregoing reasons, we affirm the orders of the district court granting the defendants' motions for judgment as a matter of law as to Bennett and Reid's § 1983 First Amendment retaliation claims and conspiracy claims and Reid's state law libel claim. We reverse the district court's grant of judgment as a matter of law in favor of Hendrix on Bennett's state law libel claim. We remand the case to the district court with instructions to consider the issues it did not address from Hendrix's motion for judgment as a matter of law.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS.**

---

of law on the ground the fliers were protected by the First Amendment. Hendrix preserved all his arguments challenging the jury verdict in his Motion for Judgment as a Matter of Law, or Alternatively, a New Trial, or Alternatively, to Amend Judgment, and thus we remand for the district court to consider these issues in the first instance.

PRYOR, Circuit Judge, concurring in part and dissenting in part:

I would affirm the judgment as a matter of law entered against Reid and Bennett. I do not see a critical difference between flyer 2 and the other flyers. Flyer 2 uses the term "convicted criminals" on the front alongside a photograph of Danny Bennett, but the other flyers use the terms "convicted felons" and "convicted criminals" on the same page that has a photograph Bennett. What protects the other flyers is the explanation beneath the photograph of Bennett ("Arrested and housed in the Forsyth Jail, Bennett gave Paxton hundreds for his smear campaign on two occasions."), but a nearly identical explanation ("This man, arrested and housed in the Forsyth County Jail, gave hundreds in cash to Paxton's campaign on two different occasions.") appears below the photograph of Bennett on the front of flyer 2. That explanation is important to all the flyers because all the flyers also display a photograph of at least one convicted felon.

We should not read the front of flyer 2 in isolation. The flyer has two pages, front and back. The two sides should be read together for the same reason that we read the statements and photographs on each side of each flyer together. The front of flyer 2 uses the term "convicted criminals," and the back of the flyer has a photograph of a convicted criminal. The front of the flyer has a truthful assertion immediately below the photograph of Bennett ("This man, arrested and

40

housed in the Forsyth County Jail, gave hundreds in cash to Paxton's campaign on two different occasions."). The reference to "convicted criminals" on the front of the flyer does not name or identify anyone. The reference to convicted criminals is included in a general question ("Should a Candidate for Sheriff finance his campaign using cash from convicted criminals?") that is answered on the back of the flyer ("Ted Paxton thinks so."). The answer on the back appears on the same page with the photograph of Julien Bowen and a caption that identifies him as a convicted criminal ("Defeated Commissioner plead guilty to kidnapping his wife at gunpoint. His contributors are now giving thousands to Paxton."). The answer on the back also appears above the general question, "It's scary isn't it?", followed by the statement, "A candidate for Sheriff taking money from convicted criminals and their associates."

The question on the front of flyer 2 is a common ploy in political propaganda that invites the reader to turn over the flyer and read the back. All three flyers use this ploy. The front of flyer 1 uses the beginning of a statement ("You know your Sheriff is doing a good job when ...") that is finished on the back of the flyer ("... criminals are supporting his opponents [sic] campaign."). The front of flyer 3 uses a question ("What do you think?") that is followed by a more specific question on the back ("Should this Gang run your Sheriff's Office?").

41

An average reader would consider that the nature of the medium, a campaign flyer, presents rhetorical hyperbole, and that reader would assume that Sheriff Dennis Hendrix placed the most damning assertion possible below the photograph of each person depicted. The reader would see the reference to convicted criminals in the general question on the front of flyer 2, but would also see that the most damning assertion about Bennett is that he had been arrested and housed in the jail. The reader also would read the answer on the back of the flyer alongside a photograph of a person identified as a convicted criminal.

I admit that this question is a close one, and I fully concur in the other aspects of the majority opinion. Perhaps the district court will be able to resolve this controversy on one of the alternative grounds for a judgment as a matter of law. A new trial of the claim of defamation as it relates only to flyer 2 several years after the election in which Hendrix was defeated would appear to be a colossal waste of resources. I respectfully dissent from that part of the majority opinion that reverses the judgment as a matter of law against Bennett's complaint of defamation.